**Nicholas GOMEZ, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 89–1094.**

District of Columbia Court of Appeals.

Argued Dec. 5, 1990.
Decided Sept. 30, 1991.

---

James G. McGuire, appointed by this court, for appellant.

Corbin A. Weiss, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and Ronald Walutes, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and BELSON, Senior Judge.*

SCHWELB, Associate Judge.

Nicholas Gomez was found guilty at a stipulated bench trial of three misdemeanor weapons offenses.[1] On appeal, he contends that the trial judge committed reversible error by denying his dispositive pretrial motions to suppress tangible evidence (the pistol and ammunition), as well as an inculpatory pretrial statement which Gomez made while in police custody following his arrest. We affirm.

## I

## THE EVIDENCE

### A. The arrest.

Officer Robert LoProto of the Metropolitan Police Department testified at the hearing on Gomez' motions that on December 9, 1988, at approximately 10:00 p.m., he monitored a radio run reporting that, according to an anonymous tipster, subjects were dealing drugs out of a vehicle in the rear of 1223 N Street, N.W. Approximately four minutes after hearing the radio run, Officer LoProto and another officer, both in uniform, arrived at the scene of the alleged drug activity. The "rear" of 1223 N Street is the middle of a narrow alley which runs between 12th and 13th streets.

Officer LoProto testified that he was familiar with this alley because he routinely patrolled the area. He knew that drugs were frequently sold and consumed in the vicinity of the alley. With the other officer behind him, Officer LoProto entered the alley on foot and saw two automobiles side by side. He approached the vehicles and discovered that four people were sitting in one, an Audi, and that there were two

---

* Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. The offenses were carrying a pistol without a license (CPWOL), D.C.Code § 22–3203 (1989); unlawful possession of unregistered firearm (UF), *id.* § 6–2311(a) (1989) and unlawful possession of ammunition for an unregistered firearm, *id.* § 6–2361(3) (1989).

people in the other. The alley was dark, and there were no lights on in either car.

Officer LoProto testified that, upon approaching the vehicles, he asked the occupants to step out of them. After all six of them had done so, he looked into the Audi from his position outside the passenger side of the vehicle. With the help of the dome light [2] and his own flashlight, Officer LoProto observed a pistol lying, in plain view, on the rear floor of the car, slightly towards the passenger side. The officer removed the pistol and arrested Gomez, who had been sitting in the seat nearest the pistol.

The defense presented the testimony of Jaime Gusman, another occupant of the Audi, and of Gomez himself.[3] Gomez, who came to this country from El Salvador and testified that he spoke little English and could not read or write either English or Spanish, testified through an interpreter. Both Gusman and Gomez asserted that the officers roughly ordered them out of the car. Each claimed that the pistol was not in plain view and that it was recovered only after a thorough search of the vehicle, including the trunk. Both of the defense witnesses stated that, upon locating the weapon, Officer LoProto told them not to move "or I'll blow your fucking head off," or words to that effect. Gusman also claimed that he was punched in the face and kicked in the knee by the police.

### B. The inculpatory statement.

Gomez and one of his companions were arrested and taken to the Third District station house. The officers relieved Gomez of his shoe laces and his keys. They handcuffed him to a table by his left wrist. Officer LoProto presented Gomez with a Spanish-language "PD–47" (waiver of rights form). He left Gomez with Officer Jose Gonzalez, who spoke some Spanish.

Officer Gonzalez testified that he read Gomez the Spanish version of the *Miranda* [4] rights appearing on the PD–47.

He asked Gomez each of the four "waiver of rights" questions printed on the reverse of the form. Gomez responded "si" to each question, indicating that he understood his rights and was willing to answer questions without an attorney present. Officer Gonzalez said he then instructed Gomez to write his responses on the PD–47, and to sign the form. Officer Gonzalez and Officer LoProto watched as Gomez completed the PD–47. After signing the PD–47, Gomez admitted that the pistol belonged to him. He told the officers that he was confessing because he did not want his friend to get into trouble.

Gomez testified, in substance, that the officer who gave him directions with respect to the rights card spoke a mixture of English and defective Spanish, and that he did not understand what the officer was saying. He claimed that the officer wanted him to sign the card, and that he explained to the officer that he did not know how to write. Thereafter, according to Gomez, the officer

> stared at me. He put it on a piece of paper and said put it—trace it over here to this one. I wrote it there. He said this isn't anything, you will get out tomorrow.

Q. Now, why did you trace the words si, si, si, si?

A. He told me to.

\* \* \* \* \* \*

Q. Did you feel that you had the right not to write the words si, si, si, si if you so chose?

A. Me?

Q. Yes?

A. No.

Q. Did you understand in any way the writing that was on the piece of paper which you signed?

A. No.

Gomez readily admitted that he had confessed to the police officers, and reiterated

---

**2.** Gomez testified that the dome light was not working.

**3.** Two other men who were allegedly in one of the two cars invoked their privilege against self-

incrimination and declined to testify on behalf of Gomez.

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

that he had done so to protect his innocent friend. Defense counsel also elicited from Gomez that he had seen Spanish-speaking people arrested on previous occasions and that they were treated unfairly. He said he had many friends who "tell me that you cannot get involved with the police because you will be the loser."

## II

## THE TRIAL COURT'S DECISION

### A. *The Fourth Amendment claim.*

Gomez contended that the police had seized him in violation of the Fourth Amendment by ordering him out of the car without probable cause to believe, or articulable basis to suspect, that he had committed an offense. He claimed that the recovery of the pistol was the fruit of that unlawful seizure. The government responded that Gomez lacked standing under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), to complain of the search of a car in which he was a passenger, and that even if he had standing, the facts available to the police were sufficient to raise an articulable suspicion of unlawful conduct, and thus supported a brief investigative detention.

At the conclusion of the hearing, the trial judge found the facts as follows:

Officer LoProto received a radio run on December 8th of 1988 at about 10 p.m. This radio run stated that a subject [5] was dealing drugs in a car in the rear of 1223 M Street, Northwest. This area is a high drug area.

Officer LoProto was familiar with the area, according to him, and the specific location also from walking a foot beat in that area. It was dark at that time. As Officer LoProto and the other officers went into the alley, he found two cars with a total of six people in the cars. The Defendant, Nicholas Gomez, was in a silver Audi in the alley.

Pursuant to police directions, the people in the cars exited the vehicle. After the silver Fox—excuse me—the silver Audi was vacated, Officer LoProto found a weapon in that car near where the defendant had been sitting. Officer LoProto was outside of the car and looking in the car. At the time that he was looking into the car, he had the aid of a flashlight.

The Audi was not owned by the defendant. The defendant was riding in the rear of the car as a passenger. The defendant and another man were arrested and the defendant was transported to the police station.

Turning to the legal issues, the judge held that Gomez lacked standing under *Rakas* to challenge the seizure because he had no legitimate expectation of privacy in the passenger compartment of the car. In the alternative, he also ruled against Gomez on the merits:

I find that the police officers acted with a basis to say that they had an articulable suspicion, [that] basis being that they were dealing in a high crime area; that the information received was that someone was in a car and dealing drugs at a stated place. That is, the tip itself, or the information that was received, is not in and of itself sufficient to justify a *Terry* stop.[6] But, it is one factor to be considered, taken in the totality of the circumstances. I think that, in conjunction with the other things that I am about to mention, is sufficient.

Also, two cars were found in roughly the location that is contained in the information that the police had received. There were six people sitting in the two cars. This could have been, under the way that the officers observed the scene, it could have been a drug sale situation. Also, the event happened late at night. It was dark. The interiors of the cars were also dark. The officers had legitimate safety concerns at that point. The police also responded four minutes after the call was received to the area that had been specified in the information.

---

**5.** Actually, the officer testified that the radio run specified subjects in the plural.

**6.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The case is similar to the *Johnson* case at 496 A.2d 592.[7] The added factor in *Johnson* [is] the police receipt of the call describing the sale, the fact that the sale was happening out of a car, and the location of where the sale was supposed to be happening. The stop by the police therefore under *Terry* is determined by the court to be valid.

Once the valid stop had been made by the police, and I find that a stop had been made, the police can look into the car from the outside using a flashlight to view and seize contraband.

I cite for that proposition *Texas v. Brown*, 460 U.S. 730 [103 S.Ct. 1535, 75 L.Ed.2d 502] [1983]. That case said that there is no reasonable expectation of privacy in shielding the interior of the car from the public that can see through windows in any case....

## B. The Fifth Amendment claim.

The trial judge disposed summarily of the motion to suppress Gomez' pretrial statement:

The defendant's *Miranda* rights were read to him by a Spanish-speaking officer, that is Officer Gonzalez, and the defendant filled out a P.D. 47, advice of rights card, that is Government's Exhibit Number 1, which the court notes is also in Spanish.

The court does not credit the defendant's testimony with regard to the preparation of Government's Exhibit Number 1 and the way that things, for instance, were traced on to that card.

The court finds that the defendant's Fifth Amendment waiver was voluntary and knowing and that his statement evidencing ownership of the gun was made in the station after he waived those Fifth Amendment rights.

After the judge had denied the suppression motions, the prosecution and the defense agreed to a bench trial and stipulated that the evidence presented during the suppression hearing would be admitted at trial. At the conclusion of that trial, the judge found Gomez guilty as charged, suspended imposition of sentence, placed Gomez on probation, and directed that he perform forty hours of community service. This appeal followed.

## III

## LEGAL DISCUSSION

### A. The Fourth Amendment.

■ The trial judge found, and we agree, that Gomez was stopped or "seized," when he was ordered out of the car and told to place his hands on the vehicle. *Jones v. United States*, 391 A.2d 1188, 1190 (D.C.1978). He was not free to leave, or to ignore the police and go about his business. *See, e.g., California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1549–51, 113 L.Ed.2d 690 (1991). An officer has no authority to stop, seize or detain an individual without an "articulable suspicion" of criminal conduct on the part of that individual. *Brown v. United States*, 590 A.2d 1008, 1013 (D.C.1991). The principal question in this case is whether the information available to the police at the time of the seizure was sufficient to raise an articulable suspicion of criminal conduct on Gomez' part.[8]

■ The requirement of "articulable suspicion" is not an onerous one. "The Fourth Amendment does not require a [police officer] who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). As the Supreme Court explained in *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989),

---

7. *United States v. [Harvey] Johnson*, 496 A.2d 592 (D.C.1985).

8. The trial judge ruled that Gomez lacked standing to object to the search. We recently held in *Cousart v. United States*, No. 88–1120, slip op. at 6, n. 5, 1991 WL 188785 (D.C. Sept. 20, 1991), that *Rakas* "does not preclude a passenger in a car from objecting to his seizure and seeking to suppress evidence that is a fruit of the seizure." We follow *Cousart* and the authorities there cited.

[t]he Fourth Amendment requires 'some *minimal level of objective justification'* for making the stop *INS v. Delgado,* 466 U.S. 210, 217 [104 S.Ct. 1758, 1763, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.

(Emphasis added). *Accord, Brown, supra,* 590 A.2d at 1014.

Both the Supreme Court and this court have had occasion since the trial court's decision to consider the meaning of the phrase "minimal level of objective justification" in the context of an anonymous tip. *Alabama v. White,* — U.S. —, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Cauthen v. United States,* 592 A.2d 1021, 1022–25 (D.C.1991); *Brown, supra,* 590 A.2d at 1012–14. We will not repeat here all that was written in these cases, except to reiterate that, as the trial judge stated, the anonymous tip alone is insufficient, that some significant corroboration is required,[9] that the determination whether articulable suspicion exists must be made on the basis of the totality of the circumstances, and that an appellate court must accept the trial court's evidentiary findings if supported by substantial evidence, but reviews *de novo* that court's legal conclusions. *Cauthen, supra,* 592 A.2d at 1022; *Brown, supra,* 590 A.2d at 1020–24. Each case turns on its particular facts, and "case matching" is of limited utility in Fourth Amendment analysis of street encounters between citizens and police officers, for "two cases are seldom sufficiently alike for the first to be an absolute binding precedent for the second." *Arrington v. United States,* 311 A.2d 838, 840 (D.C.1973); *see also Price v. United States,* 429 A.2d 514, 518 (D.C.1981). Finally, courts must address cases of this kind with a worldly and practical outlook; indeed, we have insisted

that courts be "earthy." *Cooper v. United States,* 368 A.2d 554, 557 (D.C.1977), and display "hardnosed realism," *Lawrence v. United States,* 566 A.2d 57, 63 (D.C.1989), in assessing street (or alley) encounters between citizens and the police.

Gomez is not without ammunition in his legal arsenal. As in all anonymous tip cases, we have no direct evidence as to the informant's veracity or basis of knowledge. *See Brown, supra,* 590 A.2d at 1015. The tipster reported nothing to the police regarding the appearance of the alleged drug dealers, nor did he specify their number.[10] Neither the make nor the color of the car was identified. *See id.* at 1017; *compare United States v. [Morris] Johnson,* 540 A.2d 1090 (D.C.1988) (tip that man sitting in orange Volkswagen was selling handguns at given location gave police requisite articulable suspicion when such a vehicle was sighted at that location shortly thereafter). There is nothing in the record to indicate that Gomez or any of his companions attempted to flee on the arrival of the police, or otherwise conducted themselves in a manner suggesting consciousness of guilt. *See Brown, supra,* 590 A.2d at 1019–20.

There were, however, other aspects of this case which, in our view, supported the judge's finding that the officers' conduct was reasonable under the circumstances. Perhaps the most important of these is that the alleged drug dealing took place late at night in a narrow alley [11] which was known to the police for illicit narcotics activity. The informant told the police that drugs were being sold in the alley from a car behind a given address. Four minutes later, a car was located where the tipster indicated that it would be, with a second car standing next to it. There was no other traffic in sight.[12]

---

**9.** The ability of the tipster to predict future events has significant corroborative value, *White, supra,* 110 S.Ct. at 2417, but has no "talismanic quality;" other kinds of corroboration may be sufficient. *Cauthen, supra,* 592 A.2d at 1025; *Brown, supra,* 590 A.2d at 1023.

**10.** According to Officer LoProto, as we have noted, the radio run reported subjects, in the

plural, dealing drugs, but did not specify the number.

**11.** Officer LoProto testified that at least one portion of the alley was not wide enough to permit two cars driving in opposite directions to pass each other.

**12.** The scenario in this case is quite different from that in *Brown,* in which we held that an

Such an alley is neither a thoroughfare nor a playground. Knowing of its reputation for narcotics activity, the officers could reasonably have questioned whether it was the kind of place where people sitting in cars with their lights off would assemble on a (presumably) cold December night for a purely social visit. *Cf. Jeffreys v. United States*, 312 A.2d 308, 310 (D.C.1973) (describing presence of automobile in residential neighborhood late at night with its headlights off and motor running as "suggesting the likelihood of a stealthy rendezvous and a quick getaway").[13]

To be sure, the occupants of the vehicles could have been in the alley for lawful purposes. But officers are not required to rule out the possibility of innocent behavior, for "suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity," *State v. Anderson*, 155 Wis.2d 77, 84, 454 N.W.2d 763, 766 (1990), as well as to "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges." *People v. Manis*, 268 Cal.App.2d 653, 74 Cal.Rptr. 423, 431 (1969), *quoted in* 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 9.3(b), at 432–33 (2d ed. 1987) (citation and internal quotation marks omitted). As one court explained in an anonymous tip case involving appellant's namesake, "sim-

ply because certain conduct may be construed as consistent with innocent behavior does not mean that this conduct may not form the basis for reasonable suspicion." *United States v. [Ricardo] Gomez*, 776 F.2d 542, 548 (5th Cir.1985). "[T]he applicable standard in determining the propriety of a *Terry* stop is not whether the defendant's acts can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity." *United States v. Black*, 675 F.2d 129, 137 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

Arriving on the scene almost immediately after monitoring the radio run, the officers, in our view, could readily have articulated reasons for suspecting (and therefore had a reasonable, or articulable, suspicion) that the two cars in the alley included the one from which drugs were allegedly being dealt and a second occupied by prospective purchasers. There was, in our view, sufficient evidence to permit the judge to find the requisite "minimal level of objective justification," *Sokolow, supra*, 490 U.S. at 7, 109 S.Ct. at 1585, which would warrant a brief detention of the occupants of the vehicles so that the police could investigate further.[14]

We differ, however, with the judge's apparent impression that, on these facts, the officers' "legitimate safety concerns" could properly be considered in the

---

anonymous tip had not been sufficiently corroborated to provide articulable suspicion. In *Brown*, the defendant was a part of a fast-moving street scene, and the lookout (black male, white shirt with writing on the front, and blue jeans) was so general that many persons meeting the description could have come and gone; moreover, Brown failed to match it in some respects. Here, the anonymous informant reported that drugs were being sold out of a car in a narrow alley in which there was likely to be little traffic, and four minutes later one unlit vehicle was found standing next to another in the very location where the unlawful activity had allegedly occurred. An impartial trier of fact could reasonably suspect that the cars in the alley included the one to which the tipster had referred, and yet be more doubtful that the defendant in *Brown* was the man described by the informant in that case.

13. Two unlit cars next to each other at night in an alley known for drug dealing were surely more suspicious than the scenario described in this passage from *Jeffreys*.

14. Lest we be misunderstood, we find it appropriate to reiterate that individuals are not suspect simply because they are unfortunate enough to live in a drug-infested neighborhood where crime is rampant. *[John H.] Smith v. United States*, 558 A.2d 312, 316 (D.C.1989) (en banc). In the present case, however, it was not the character of the neighborhood as a whole, but rather the combination of the tip, the unlit cars, the hour of the night, and an alley known for drug traffic that generated articulable suspicion.

articulable suspicion calculus.[15] Justice Harlan pointed out in his concurring opinion in *Terry, supra,* note 6, 392 U.S. at 32, 88 S.Ct. at 1885, that

> if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence.

(Emphasis in original.) *See also* 3 LaFave, *supra,* § 9.4(a), at 499–501, and authorities cited. In other words, if the officer lacked articulable suspicion to seize Gomez, the seizure could not be justified upon the notion that it would be dangerous to chat with Gomez and his companions without restricting their liberty. No matter how appealing the cart may be, the horse must precede it.[16]

■ We nevertheless conclude that the judge's apparent misapprehension as to the significance of the officers' safety concerns requires neither reversal nor a remand for further proceedings. Once the trial judge has made the evidentiary findings as to what occurred, the ultimate question whether articulable suspicion exists is, as we have noted, one of law. "[T]he correctness of the legal characterization of the facts appearing in the record is a matter for this [c]ourt to determine." *United States v. Mendenhall,* 446 U.S. 544, 552 n. 5, 100 S.Ct. 1870, 1876 n. 5, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *Brown, supra,* 590 A.2d at 1020. Although the case is a close one,[17] we are satisfied, for the reasons stated at pages 889 to 890, *supra,* that the facts found by him were sufficient to sustain a *Terry* stop.

We recognize that a trial court finding cannot stand if it was induced by erroneous application of the law. *In re J.M.,* 596 A.2d 961, 975 (D.C.1991). In the present case, however, the apparently premature inclusion in the articulable suspicion calculus of considerations relating to the officers' safety could not reasonably have affected the judge's findings as to the content of the tip, the brief time that elapsed between receipt of the tip by the police and the arrival of officers on the scene, the location of the two automobiles in the alley, their unlit condition, and the reputation of the alley and its environs as a site for the illicit

---

**15.** That view seems to be implicit in the judge's oral decision quoted at page 887, *supra.* We recognize, on the other hand, that the judge's brief reference to these concerns could simply have been a general observation, and not a part of his analysis of the question whether the evidence was sufficient to raise an articulable suspicion.

**16.** The posture of this issue is somewhat murky on the present record, however. The officers had an uncontested right to approach the vehicles, talk to their occupants, and ask them questions. *See, e.g. Florida v. Bostick,* — U.S. —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). They were also entitled to request these individuals to exit the cars, provided that this was done in a non-coercive fashion and the occupants had a realistic right to decline. *Id.* Indeed, given the location, the darkness, and the number of men in the two cars, such a precaution was surely eminently reasonable. Officer LoProto testified that for his own safety he asked, but did not "order," Gomez and his companions to get out of the car. He further related that he "asked them all to put their hands on the car."

The judge reasonably thought, however, that these requests, like the Godfather's offers, could not readily be refused. "Isn't it pretty clear," he asked rhetorically, "that there has been a stop, a seizure, once these people were ordered to place their hands on the front of the car?" Accordingly, the officer's characterization of his communication to the occupants as a request is not dispositive.

**17.** In prior decisions, we have sustained seizures based on anonymous tips where "all innocent details have been quickly corroborated on the scene." *United States v. Mason,* 450 A.2d 464, 466 (D.C.1982); *see also United States v. [Morris] Johnson, supra,* 540 A.2d at 1093 (quoting *Mason* ). In the present case, with the exception of the immediate discovery of the unlit cars in the predicted location in the alley, those details of the tip which were "quickly corroborated" could reasonably be viewed as somewhat skimpy. There are, however, some case-specific factors pointing the prosecution's way; see pages 889 to 890, *supra.*

distribution of drugs. These findings are, in our view, sufficient to sustain articulable suspicion, and therefore to require affirmance of the judge's decision without further proceedings in the trial court.

If the removal of Gomez from the vehicle was lawful, then the discovery and seizure of the pistol in plain view on the floor of the car, and near the location where Gomez had been sitting, were proper. Indeed, we do not understand Gomez to be making any contrary contention. Accordingly, the motion to suppress tangible evidence was correctly denied.

### B. The Fifth Amendment.

█ The question whether Gomez' admission that the pistol was his was secured in violation of his rights and of the prophylactic rule of *Miranda, supra,* need not detain us long. *Miranda* rights may be waived, and we will reverse the trial court's findings as to the voluntariness of a waiver only if they are not supported by substantial evidence. *See Hawthorne v. United States,* 504 A.2d 580, 586 (D.C.), *cert. denied sub nom. Myrick v. United States,* 479 U.S. 992, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986).

Gomez testified that he did not understand what he was signing. He gave a colorful but not necessarily compelling account of how he was forced by the police to trace uncomprehended answers on to the rights card. The officers testified, on the other hand, that they explained Gomez' rights to him and that he gave every indication that he understood them. The judge believed the officers. That Gomez was in custody and "an illiterate peasant handcuffed to a chair," as defense counsel puts it, is not conclusive. Since *Miranda* rights apply only to custodial interrogation, any waiver of *Miranda* rights is necessarily made while in custody.

It is undisputed that in his confession, Gomez stated that he incriminated himself in order to exculpate his innocent friend. His explanation of his motive further supports the view that Gomez understood that he did not have to confess, but chose to do so for a logical and well-thought-out rea-

son. *Accord, Hawthorne, supra,* 504 A.2d at 587 (remarking that the defendant " 'show[ed] a good deal of intelligence as to the decision he was making' "). We therefore conclude that the trial judge's findings with regard to Gomez' pretrial statement were supported by substantial evidence, and we uphold his refusal to suppress it.

### IV

### CONCLUSION

For the foregoing reasons, Gomez' convictions must be and each is hereby

*Affirmed.*