Arnold JEFFERSON, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CF–689.

District of Columbia Court of Appeals.

Argued June 1, 2001.
Decided June 21, 2001.

FARRELL, Associate Judge:

Responding to an anonymous tip that a particular Amoco gas station was about to be robbed, police responded to the station and saw Jefferson emerging from a fenced enclosure that permitted access to the cashier's office. They stopped and detained Jefferson until the cashier identified him as the person who had just attempted to take money and cigarettes from the office without authorization. Upon his subsequent arrest, appellant was searched and money was found on him that, along with the identification by the cashier, formed the basis for his later conviction of second-degree theft.

Jefferson contends on appeal that the police lacked reasonable articulable suspicion justifying his detention, and that the trial court therefore erred in denying his motion to suppress the identification and the fruits of the resulting search of his person. For the reasons that follow, we affirm.

## I.

Testimony at the suppression hearing established that at about 3:00 a.m. on August 2, 1998, MPD Officers Zermeno and Grunett were on patrol when they received a radio report from the police dispatcher that "a robbery ... was about to happen" at an Amoco gas station in the 900 block of Vermont Avenue, Northwest. The report in turn was based on a 911 telephone call which the police had received from a caller who would not leave his name.[1] Since the officers knew there was no 900 block of Vermont Avenue, they responded to the Amoco station at the intersection of Ver-

Lexi Negin Christ, for appellant.

Ryan H. Rainey, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Lynn Mattucci, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

---

1. Although the combined tape recording of the 911 call and the dispatcher's transmission was not played at the suppression hearing, it was played to the jury at trial. On the tape, the caller—who declined to get "involved" by giving his name—actually states that he had overheard individuals say they had taken property from the Amoco station and were about to return and attempt to steal more.

mont and Florida Avenues, "maybe a quarter block away from 9th Street," arriving there "maybe a minute" after receipt of the dispatch.[2] As they pulled into the gas station (which was open for business), they saw Jefferson "walking from the back, inside of the gate area of the station." The "gate area" was a fenced enclosure adjoining the wall of the booth that housed the cashier's office; the entrance to the office was within the enclosure. Jefferson was leaving the fenced enclosure through a gate.

As Officer Zermeno alighted and "went to grab [Jefferson]," he could see the station attendant inside the cashier's booth. In part because Zermeno "didn't know what [Jefferson] was doing behind the gate," he stopped Jefferson, "told him to grab the fence" with his hands, and patted him down.[3] At the same time, Officer Grunett stopped and frisked two men who were standing by the gas pumps. As Jefferson was being detained, Zermeno spoke to the station attendant who told him that moments earlier, when temporarily out of the office, he had seen Jefferson enter it and attempt to pack cigarettes into a bag. He ordered Jefferson to leave, but later found the cash register to be short of money by some $38. The police arrested Jefferson and seized cash in approximately that amount from his pocket.

Both officers acknowledged that the tip reported in the radio call had not described the individual(s) who were purportedly about to commit the robbery. When the officers pulled up to the station, they intended to stop and question everyone there, but in the case of Jefferson specifically, when Zermeno saw him come out

from behind the gate, the "hair on [the officer's] neck stood up" and he told himself, "stop him." Zermeno then frisked Jefferson because the radio report said "a robbery [was] about to happen," and he "wasn't taking any chances" that the suspect was armed. According to Grunett, the gas station was located in an area where there were "a lot of robberies and [a] lot of drug transactions, all kinds of activity all night long."

## II.

"A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000). But, as this court has explained, "[t]he requirement of 'articulable suspicion' is not an onerous one," *Gomez v. United States*, 597 A.2d 884, 888 (D.C.1991); it demands only that the police have " 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation omitted).

Jefferson contends that neither the 911 call of an imminent robbery of the Amoco station nor the observations of the police on arriving there gave the officers individualized suspicion that he was, or had been, engaged in wrongdoing. He relies first of all on the fact that the anonymous informant's tip, besides telling nothing about the reliability of the informant, gave no description of the individual(s) purportedly

---

**2.** The trial judge found, and Jefferson does not appear to dispute, that the police "concluded reasonably" that this gas station was the one to which the 911 caller had referred.

**3.** Jefferson took hold of the fence but kept one of his hands partly closed. Zermeno ordered him to open the hand and saw that Jefferson was clutching some quarters, which the officer then seized.

about to rob the gas station. Jefferson thus likens the information the police had to the anonymous tips found insufficient to support a stop in *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and *Cauthen v. United States*, 592 A.2d 1021 (D.C.1991). On the facts of this case, his reliance on those decisions is unfounded.

■ Although "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375 (quoting *White*, 496 U.S. at 327, 110 S.Ct. 2412). The prime example of such a tip is one containing "predictive information" that, when corroborated, shows that the informant had "knowledge of concealed criminal activity." *Id.* at 271, 272, 120 S.Ct. 1375. Jefferson does not really dispute the predictive nature of the tip here, which stated that a person or persons were "about to" rob a particular gas station. His argument is that the tip could not meaningfully be corroborated because it gave no description of the putative robbers, thus inviting the police to "round up" everyone at the Amoco station. He analogizes to our decision in *Cauthen*, in which the absence from the tip of any "physical description of the suspects by sex, race, size, clothing or any other distinguishing feature" allowed it to apply indiscriminately to any of "three to five persons" standing at the location where the criminal activity was said to be

taking place. *Cauthen*, 592 A.2d at 1021, 1023.

■ This case, however, differs markedly from both *Cauthen* and *J.L.* in the corroborating observations of suspicious behavior the police made when they arrived at the scene of the predicted robbery.[4] Unlike in *J.L.*, where the police arrived at the reported crime location "and saw three black males 'just hanging out [there],'" 529 U.S. at 268, 120 S.Ct. 1375, the police saw Jefferson emerging through a gate from a fenced area reasonably perceived to be off-limits to the public and housing the entrance to the cashier's office. That behavior caused the officers to suspect that he was the person (or among the persons) who the tip said would shortly be robbing the station. Of course, Jefferson could have been merely an employee of the station (although Officer Zermeno had seen the cashier in the office as he approached Jefferson), but the reasonable suspicion requirement does not compel the police to view ambiguous conduct innocently. As this court stated in *Gomez, supra*, in similar circumstances:

> To be sure, the occupants of the vehicles could have been in the alley for lawful purposes. But officers are not required to rule out the possibility of innocent behavior, for suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity.

597 A.2d at 890 (citation omitted). Here, as the trial judge found, Jefferson

> was emerging from a closed area next to the booth. He did not appear to be attending [to] any call or [to have] a car to which he was attending. He did not appear to be using the open booth win-

---

4. Unlike in *Cauthen*, where at least fifteen minutes separated the receipt of the tip from the police' arrival on the scene, it took the police "maybe a minute" to reach the Amoco station. Also, in *Cauthen*, this court could discern no suspicious conduct by the defendant at the scene that corroborated the tip. *See* 592 A.2d at 1024.

dow from which public transactions would occur with the gas station operator but in fact was emerging from ... what the officers reasonably believed was ... a side entrance into the booth. For purposes of reasonable suspicion, this conduct adequately furnished the link between Jefferson and the undescribed person who was reported about to rob the gas station.

 Jefferson nonetheless characterizes the police action as the sort of "dragnet seizure of three [persons] who resembled a generalized description" that we condemned in *In re A.S.*, 614 A.2d 534, 540 (D.C.1992). He points to the fact that the two men standing at the pumps were stopped and frisked as well, and—more importantly—that the officers admitted on the stand that they intended to stop and question everyone at the gas station. If, however, Jefferson's own conduct combined with the tip furnished reasonable suspicion that he was engaged in wrongdoing, as we hold it did, then he can derive no benefit from the fact that two others were seized as well, without that suspicion. *See Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). His argument that, regardless of what the officers observed, their *intent* to detain anyone at the gas station trumps the otherwise lawful basis for the stop fails both factually and legally. As a factual matter, Zermeno's reason for seizing Jefferson were mixed: He and his partner meant to stop and question anyone at the station, but Jefferson also singled himself out for suspicion because Zermeno "didn't know what he was doing behind the gate." And, as a legal matter, if the police had objective reason to stop Jefferson because of his conduct (together with the tip), the

fact that they intended to stop and question him based on the radio report alone did not invalidate the seizure. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (" '[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons ... provid[ing] the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' ") (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)); *Arkansas v. Sullivan*, —— U.S. ——, —— – ——, 121 S.Ct. 1876, 1877–78, 149 L.Ed.2d 994, 2001 U.S. LEXIS 4118, at 4–5 (2001).

 Jefferson argues, lastly, that even if the police had a lawful basis to stop him, they lacked sufficient reason to suspect that he was armed and thus to frisk him and order him to open his hand (see note 3, *supra*). Jefferson's arrest and the search of his person incident thereto, however, did not stem from anything seized in the frisk, but rather from his identification by the cashier—during his detention—as the person who had taken property without right moments before.[5] In any event, Zermeno frisked Jefferson because the radio call "said it was a robbery about to happen, [so] I wasn't taking any chances ... [that] he had [a weapon]." Given the report of an impending robbery at 3:00 a.m. in a neighborhood that had "a lot of robberies," Zermeno had reasonable grounds to believe that Jefferson might be armed and a danger to his safety. *See, e.g., Hicks v. United States*, 730 A.2d 657, 661 (D.C.1999); *see also J.L., supra*, 529 U.S. at 274, 120 S.Ct. 1375 (Court's decision "in no way diminishes a police officer's prerogative ... to conduct a protective

---

5. Although Zermeno took some quarters from Jefferson's hand during the stop and frisk, Jefferson does not—and could not reasonably—argue that testimony simply about the discovery of coins in his hand was instrumental to the jury's finding of guilt.

search of a person who has already been legitimately stopped").

*Affirmed.*