Trayone FLEMING, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CF–879.

District of Columbia Court of Appeals.

Argued Jan. 25, 2006.

Decided April 26, 2007.

Mindy A. Daniels, appointed by the court, for appellant.

John W. Borchert, for appellee. Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and David B. Goodhand, Jocelyn Ballantine and Timothy J. Kelly, Assistant United States Attorneys, were on the brief for appellee.

Before REID and GLICKMAN, Associate Judges, and COMBS–GREENE, Associate Judge, Superior Court of the District of Columbia, sitting by designation.

REID, Associate Judge:

Appellant Trayone Fleming was convicted of possession of a controlled substance (PCP) with intent to distribute, in violation of D.C.Code § 48–904.01(a)(1) (2001). He asserts that the trial court erred by (1) ruling that the informant was reliable and therefore the police had reasonable, articulable suspicion to stop him; (2) admitting testimony from one police officer that another officer said he voluntarily consented to the search of his person; (3) failing to rule that the testimony of two police officers at trial constituted *Brady*[1] evidence unlawfully withheld by the government during the suppression hearing; (4) admitting drug evidence since the government failed to establish the chain of custody; and (5) limiting examination of a police officer regarding his field test of the drug evidence. Discerning no error, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented evidence showing that Mr. Fleming was involved in a drug transaction on or about October 1, 2003, and subsequently was arrested and indicted. At a hearing on Mr. Fleming's motion to suppress evidence, the government presented two witnesses. Metropolitan Police Department ("MPD") Officer Devinci Wooden[2] testified that he received a call "around 3:55 p.m." from a person who had "provided information in the past about certain patterns of narcotic sellers in certain areas. . . ." The informant was not known as a drug user. On two occasions, information from the informant resulted in arrests. The informant also conveyed information about two other persons, but Officer Wooden was unable to act on it because he suffered an injury. The informant, who was not paid, told Officer Wooden that "he knew a person by the name of Tray"; that Tray "would be between Sixth and Seventh and N Street," in the Northwest quadrant of the District "selling PCP and that he had PCP on his person." The informant described Tray as "a black male . . ., wearing a brown jacket, khaki type; khaki-like color, like brown khaki-like color pants, . . . and he had a close fade-type haircut." He also was "wearing white tennis shoes." Officer Wooden contacted Sgt. David Poe of the MPD and gave him the information from the informant.

Sgt. Poe testified that the contact came at "approximately 1630 [hours]" or 4:30, and that Officer Wooden informed him "that there was a male holding narcotics in the 600 block of N Street Northwest"; and that the person was a "[b]lack male" with a "faded haircut; white tennis shoes; wearing beige khaki pants; beige coat." Sgt. Poe proceeded to the N Street area with three other police officers, including Officers Rondell Baker and Franklyn Then. The officers arrived there "around 1645–ish" and noticed "[b]etween 10 and 12 [males]." Sgt. Poe identified Mr. Fleming as one of the persons he saw. Mr. Fleming was wearing "the beige khakis and the beige colored top." The other persons present in the area had on "[b]lack tops, either sweaters or jackets, and blue jeans." No one else had on a beige jacket and beige pants.

The officers drove past the area and around the corner. Two of the officers exited the vehicle. The other two officers returned to the front of the apartment

---

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. The officer's last name also appears erroneously in the record as "Wooten."

complex on N Street, got out of the car, approached Mr. Fleming, "and made a little conversation with him." Officer Baker "put his hands (around the shoulder area) on [Mr. Fleming] and started talking to him." Officer Baker said the officers "received a drug complaint." Mr. Fleming "started asking why [the officers] were bothering him, he wasn't doing anything." When the other two officers returned to the front, "they ... took control of [Mr. Fleming]," that is, they "monitor[ed]" him while Officer Baker made a telephone call; Mr. Fleming was not handcuffed at that point. "Officer Then and [Mr. Fleming] were having some type of conversation." Officer Then asked whether Mr. Fleming "would consent to a search." Mr. Fleming said, "Yes." Officer Then proceeded "to pat [Mr. Fleming's] pockets and move his clothing around to see if he had anything on him." As Officer Then was "moving [Mr. Fleming's] shirt up around the right side, ... [Mr. Fleming] made a motion as if he wanted to run.... He tried to get away." Officers Then and Baker and Sgt. Poe all "grabbed" Mr. Fleming and they fell to the ground. Officer Then "said he's got it [the drugs] on him." Mr. Fleming was handcuffed, and Officer Then "lifted up his shirt and recovered a bag from inside [Mr. Fleming's] waistband." The bag later was found to contain "[m]arijuana laced with PCP."

At the conclusion of the suppression hearing, the trial court denied Mr. Fleming's motion to suppress evidence, finding, in part, that the person who called Officer Wooden was "a reliable informant within the Fourth Amendment," and that Officer Wooden "could rely on information he had provided." Furthermore, "[t]he police at the very least had reasonable suspicion on which they could stop [Mr. Fleming] at the point that they observed him in this block matching the description provided by the [informant]." The trial court regarded the question of probable cause as "an extreme-

ly close question." The trial judge stated that "there would be better evidence in the record of [Mr. Fleming's] consent had Officer Then himself testified," but that "hearsay is admissible." The judge then "credit[ed] entirely Sgt. Poe's testimony regarding the events of [the] day and that he was told by Officer Then that the consent had taken place." The court proceeded to "find that [Mr. Fleming's] consent and the circumstances in which the defendant then began to run after the officer observed a plastic bag sticking out of the pants gave the police probable cause to believe that [Mr. Fleming] in fact possessed contraband." And, "in the event that [Mr. Fleming] withdrew his consent, the officers had already seen the bag and felt it and had probable cause to believe that it contained contraband. As a result, they could lawfully remove the bag and discover its contents."

At trial, the government's witnesses were Officers Baker and Then, as well as Officer Kristian Paul Kimbell who dusted the bag removed from Mr. Fleming's waist for fingerprints, and Officer Christopher Stone, who testified as an expert on drug matters, including testing and reporting procedures. Officer Baker testified that he identified himself to Mr. Fleming, "grabbed his arm," and that, "based on [his] experience," he "smelled an odor of PCP on Mr. Fleming." He "patted Mr. Fleming down for any type of weapons," but found none. He asked Officer Then to "watch Mr. Fleming" and then he called Officer Wooden.

Officer Then stated that he was in an unmarked car with Sgt. Poe, Officer Baker, and another officer when they saw Mr. Fleming. Officer Then, who had on his "raid jacket" with MPD on the back and side, and another officer, exited the vehicle and walked until they met Sgt. Poe and Officer Baker who had stopped Mr. Flem-

ing. Officer Then and the fourth officer "engaged in a small conversation with [Mr. Fleming]" who asked "why [the officers] were stopping him out of all the individuals that were out there." The officers replied that they were conducting an investigation. In response to Officer Then's question, Mr. Fleming said he had no weapons on his person. Officer Then "asked him if he didn't mind if we went ahead and searched him." Mr. Fleming "indicated he had no problem with [the search]." Officer Then began to "pat" Mr. Fleming down, tried "to feel what was in his pockets," "lifted up his shirt" and saw what "appeared to be a plastic bag which was stuck in the middle of his waist." Mr. Fleming "attempted to physically ... become free from [Officer Then] ... and flee." He "attempted to run." The officers and Mr. Fleming "struggle[d]." Mr. Fleming was handcuffed and Officer Then "retrieved the object from his waist." The object "was a plastic bag which contained 21 small foils" with "a green, greenish weed-like substance."

Two witnesses were called for the defense, Markeith A. Banner, a manager of Airborne Express who grew up with Mr. Fleming, and Officer Baker. Mr. Banner stated that the officers asked whether Mr. Fleming was Tray and proceed[ed] to search him. He did not hear the officers ask Mr. Fleming whether they could search him. Nothing was recovered and Mr. Fleming was handcuffed. A second and third search of Mr. Fleming also turned up nothing. However, Mr. Banner saw the officers with a plastic bag but "didn't see them get it off of [Mr. Fleming]." Officer Baker initially testified that the substance in the tinfoils recovered from the plastic bags was not field tested, but he later acknowledged that the PD–251 incident report, which he completed, indicated that the substance tested negative for marijuana. He did not remember who conducted the field test.

## ANALYSIS

### The Reliability of the Informant

Mr. Fleming contends "that the informant was not shown to be reliable, that the officer who relied on the tip was not on the scene, and that the informant's tip was not corroborated in sufficient detail to justify [the officers] stopping and searching Mr. Fleming." The government maintains that the informant was reliable because (1) his or her identity was known, making it possible to hold him or her accountable for fabricating information, (2) the information provided by him or her in the past had proven accurate; and (3) the information was based on his or her personal observations.

The Supreme Court has "differentiated the case of the anonymous telephone tipster from that of a 'known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated.'" *Davis v. United States*, 759 A.2d 665, 670 (D.C. 2000) (citing *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)). "Information from [the latter] will support, at least, a finding of articulable suspicion." *Id.* and n. 9 (citing *Sanders v. United States*, 751 A.2d 952, 955 n. 9 (D.C. 2000)). Furthermore, "[a]lthough an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity, there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Jefferson v. United States*, 776 A.2d 576, 579 (D.C.2001) (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and *J.L.*, *supra*, 529 U.S. at 270, 120 S.Ct. 1375) (internal quotation marks and other citation omitted); *see also Barrie v. United States*, 887 A.2d 29, 32 (D.C.2005) ("informant was speaking of his own personal

knowledge" based on "his own direct observations of [a] drug sale").

 Here, not only was the unpaid informant known to Officer Wooden, but on two prior occasions his information had resulted in arrests. Moreover, the informant spoke from personal knowledge and direct observations, referring to the defendant by the name "Tray," specifying the precise place where he could be found, providing a detailed description, including type of clothes and shoes worn, racial identity, and describing his haircut. The informant was not paid and hence had no reason to lie to gain monetary payment. *See Rutledge v. United States,* 392 A.2d 1062, 1066 (D.C.1978). Nor did he or she have incentive to lie to obtain drugs, because the informant did not use drugs. And, he or she understood that if false information were given to Officer Wooden, that could have an impact on his own sentencing in a pending criminal matter. Under these circumstances, we agree with the trial judge that the informant was reliable and the information he gave to Officer Wooden was sufficiently detailed to provide the police with reasonable articulable suspicion that criminal activity was unfolding, thus justifying an investigatory stop of Mr. Fleming under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Wilson v. United States,* 802 A.2d 367, 369 (D.C.2002); *Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991).

### The Consent To Search Issue

Mr. Fleming complains that the trial court based its pre-trial finding, that he consented to the search of his person, on hearsay testimony presented by Sgt. Poe concerning what Officer Then told him. He asserts that Sgt. Poe's "testimony lacked reliability" and that "there was too little upon which the court could base its decision that there was valid consent." The government argues that the consent issue should be resolved under the plain error standard since Mr. Fleming did not raise the hearsay objection at the suppression hearing. In addition, the government points out that Officer Then testified about Mr. Fleming's consent during trial.

 As we have said previously, "the Supreme Court in *United States v. Matlock,* 415 U.S. 164, 172–77, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), held that because the rules of evidence normally applicable in criminal trials do not operate with full force in suppression hearings before a judge, reliable hearsay would be admissible." *Mitchell v. United States,* 368 A.2d 514, 518 (D.C.1977) (internal quotation marks omitted). Here, the trial court found that Sgt. Poe's testimony at the suppression hearing "was not evasive," that he "testified clearly and [did not] embellish or change his testimony." Hence, the trial court "credited fully" Sgt. Poe's suppression hearing testimony. Given this determination, we cannot say on this record that the trial court committed plain error in finding consent. *See Abdus–Price v. United States,* 873 A.2d 326, 330 (D.C. 2005) (referencing *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)) ("defining plain error as that which is obvious or plain, affects substantial rights, and results in a miscarriage of justice or seriously affects the fairness and integrity of the trial").

 Furthermore, Officer Then's trial testimony confirmed Sgt. Poe's account that Mr. Fleming consented to the search. Trial testimony may be considered in reviewing the trial court's disposition of a motion to suppress. *See Martin v. United States,* 567 A.2d 896, 902–903 n. 16 (D.C. 1989). Officer Then testified that after Mr. Fleming was stopped, he asked why he was stopped, and was told that "it was an investigation." He was asked whether he had any weapons on him and he re-

sponded in the negative. Officer Then "asked him if he didn't mind if [the police] went ahead and searched him, which he indicated he had no problem with." The officer described how he conducted the search, Mr. Fleming's attempt to flee, and the discovery of the "plastic bag which contained 21 small foils ... [with] a green, greenish weed-like substance." In light of Sgt. Poe's suppression hearing testimony and Officer Then's trial testimony, we see no reason to disturb the trial court's finding that Mr. Fleming consented to the search of his person. Nor are we persuaded by Mr. Fleming's argument in his reply brief that "the government failed to prove by a preponderance of clear and convincing evidence that a consent occurred and if so, that it was voluntary under the totality of the circumstances presented here." [3]

### The Chain of Custody Issue

Mr. Fleming argues that the trial court erred in admitting the drug evidence because "there is not only an absence of testimony to establish the chain of custody," but "also a significant disparity in the government's evidence in this regard, with no accounting for it." He maintains that "Officers Then and Baker cannot both be right"; that is, Officer Then maintained that he kept the drugs on his person from the time he sized them from Mr. Fleming to the point where he gave them to Officer Kimbell and that there was no field-test of the drugs for PCP, whereas Officer Baker filed a report indicating that the drugs were field-tested for marijuana. The government contends that there was no objection to the admission of the drug evidence, that our review is only for plain error, and that "[t]he trial court did not abuse its discretion, let alone 'plainly err in admitting the drug evidence ... because the government presented evidence more than sufficient to demonstrate the chain of custody to a reasonable probability.' "

■■■ "The trial court has broad discretion in determining the admissibility of physical evidence." *Gilmore v. United States*, 742 A.2d 862, 871 (D.C.1999) (citing *Ford v. United States*, 396 A.2d 191, 194 (D.C.1978)). "In exercising that discretion, the court must be satisfied that in reasonable probability the article has not been changed in important aspects." *Id.* (Internal quotation marks and citation omitted). "Because drugs are fungible, the government [is] required to prove that the material seized from [Mr. Fleming] by the police and thought to be illegal drugs was the same material analyzed by the chemist and found to be [PCP]." *Turney v. United States*, 626 A.2d 872, 873 (D.C. 1993) (citation omitted). The government enjoys the benefit of a presumption, in the absence of evidence of tampering, "that when physical evidence is in the hands of the government, ... it has been handled properly," *In re D.S.*, 747 A.2d 1182, 1187 (D.C.2000) (citing *Ford, supra,* 396 A.2d at 194–95), or that "government officials charged with its keeping, ... properly discharged their duties." *Ford, supra,* 396 A.2d at 194.

---

**3.** We are not persuaded either by Mr. Fleming's argument that, in essence, the trial court permitted the government to violate *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not calling Officers Then and Baker to testify at the suppression hearing. "Under the *Brady* doctrine, suppression of favorable evidence by the prosecution requires reversal of conviction if there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Benton v. United States*, 815 A.2d 371, 372 (D.C.2003) (quoting *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotation marks omitted)). The testimony of the officers in this case was not exculpatory and would not have altered the outcome of the suppression hearing. *See Rowland v. United States*, 840 A.2d 664, 687 (D.C.2004); *see also Sykes v. United States*, 897 A.2d 769, 777 (D.C.2006).

The defense must rebut that presumption "by showing that the drugs had been tampered with or that the drugs allegedly seized from [Mr. Fleming] were indistinguishable from other exhibits of illegal drugs handled by the officers on the same day and that, hence, there was a defect in a link in the chain." *Turney, supra,* 626 A.2d at 874 (citations omitted); *see also Gilmore, supra,* 742 A.2d at 871 (defendant must rebut presumption by "introduc[ing] evidence that the routine handling of the evidence by the government did not suitably preserve [it] ... by making a minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering") (citing *German v. United States* 525 A.2d 596, 610 (D.C.1987)) (other citation and internal quotation marks omitted). "[V]ariations in the testimony [regarding the chain of custody] would affect only its weight, not its admissibility." *Brooks v. United States,* 717 A.2d 323, 328 (D.C.1998) (citations omitted).

Officer Then declared that after he removed the plastic bag containing 21 small foils with a greenish weed-like substance from Mr. Fleming's waist, he "held on to it" until he returned to the Third District police station, and then "handed it over to Officer Kimbell, who does fingerprints." He remained with Officer Kimbell and after Officer Kimbell completed his work, Officer Then "retrieved the bag, placed it in the heat seal and dropped it in the drug box." Officer Then identified Government Exhibit 3B as "the DEA 7 that accompanies the PD–95 which [he] filled out ... on 10–1–03." In addition, he identified Government Exhibit 3A as "the heat seal PD 95 [the police] filled out on [October 10, 2003] and heat sealed it, signed it, placed the time on it ... and dropped it in the drop box."

On cross-examination, Officer Then responded, "No" when asked whether he "conduct[ed] a field test on the item that [he] recovered." He did not "know of" anyone who did a field test on the substance contained in the bag and maintained that he "never handed [the bag] over to anyone else" at the crime scene. On redirect examination, the prosecutor inquired whether there was a field test for PCP. Officer Then replied, "No," and agreed that it would not "have been possible for [him] to conduct a field[ ] test."

According to Officer Kimbell's trial testimony, Officer Then gave him "a ... clear plastic ziplock bag which ... contained a total of 21 pieces of tinfoil which had a strong chemical odor to them." When asked whether he "recognize[d] what's in Government's Exhibit 3A," Officer Kimbell replied, "[a]ppears to be the same tinfoils and ziplock bag that [Officer Then] handed me to process that day for him." After dusting the ziplock bag for fingerprints, Officer Kimbell returned the bag to Officer Then.

In his testimony for the government, Officer Baker confirmed that Officer Then "recovered a freezer bag containing tinfoils from [Mr. Fleming]." On cross-examination, Officer Baker testified that he went back to his car to call Officer Wooden "to ask him where the drugs [were] supposed to be located [ ] on Mr. Fleming," but Officer Wooden only knew that the drugs were on Mr. Fleming's person. After Officer Baker "got off the phone [ ] [he] was advised that Officer Then made a recovery." Officer Baker did not see the actual recovery of the plastic bag, but he saw the bag "in Officer Then's possession." Two other officers were "in the area, but [Officer Baker was] not sure what they [were] doing." While defense counsel posed cross-examination questions regarding the chain of custody for the money recovered from Mr. Fleming, no questions were posed pertaining to the chain of custody for the plastic bag.

Detective Mark Christopher Stone testified for the government "as an expert in the safeguarding of narcotic evidence between the Metropolitan Police Department and the Drug Enforcement Administration, in the testing and reporting procedures of the DEA," and other matters. He pointed out that a "[s]ubstance such as PCP is not often [ ] field-tested by [the police] because of the danger surrounding the substance," and that "[u]sually the odor of the substance will indicate to the officer[s] that they might indeed have [PCP]." He described the procedure for placing the substance removed from a person in a plastic container, the heat sealing process, the DEA report, the mailbox where the heat sealed package is placed, the hand carrying of the package to the DEA laboratory in Largo, Maryland, the examination of the package by DEA for contamination, the testing of the substance, the repackaging of the drug evidence, its placement in a locked room, and its pick up for use at court. He presented testimony concerning Government Exhibits 3A and 3B. Defense counsel raised no objection to the admission of these exhibits. Detective Stone then explained what the chemist found in the plastic bag that he analyzed. The substance in the bag was "very potent," and "roughly about 300 and 60 milligrams of pure PCP . . . ."

Officer Baker was called as a witness for the defense. Although he initially denied testifying that the drugs recovered from Mr. Fleming were field [ ] tested, he later acknowledged stating on a PD–251 "that a portion of the weed field-test was negative for cannabis." However, he was not "sure who did the field-test." The PD–251 was admitted into evidence without objection.

▇▇▇ On this record, we conclude that the government satisfied its burden to demonstrate that the plastic bag which Officer Then took from Mr. Fleming's person, was the same bag whose contents were analyzed by the DEA chemist and found to contain PCP. *Turney, supra,* 626 A.2d at 873. Officer Then testified that he kept the plastic bag until he handed it to Officer Kimbell. He remained with Officer Kimbell until the bag was returned to him and he placed it in the heat seal and dropped it in the drug box. Detective Stone outlined the routine procedures followed by the government in safeguarding drug evidence, including the steps taken to retrieve the heat-sealed package, transport it to the DEA laboratory, and after analysis, the process for repackaging and securing the evidence until it is picked up for court. It is true that Officer Baker did not see Officer Then remove the plastic bag from Mr. Fleming, but reasonable jurors could have credited the testimony of Officer Then. In addition, while there was an inconsistency between the testimony of Officer Then and Officer Baker as to whether a field test was done on the plastic bag taken from Mr. Fleming, thus suggesting a possible break in the chain of custody, "variations in the testimony [of Officer Then and Officer Baker] would affect only its weight, not its admissibility," *Brooks, supra,* 717 A.2d at 328; and Detective Stone asserted that PCP is not often field tested. Significantly, nothing in the record convinces us that Mr. Fleming rebutted the presumption that the government properly handled the drug evidence. *See Ford, supra,* 396 A.2d at 194. The record contains not even a hint of tampering with the drug evidence, or ill will or bad faith on the part of the government toward Mr. Fleming. *See Gilmore, supra,* 742 A.2d at 871. Consequently, we see no reason to disturb the trial court's admission of the drug evidence.

### The Trial Court's Limits on the Defense Examination of Officer Baker

Finally, Mr. Fleming contends that the trial court erred in limiting his examina-

tion of Officer Baker as to the drug field test on grounds of relevancy. He complains that "the trial court cut off defense counsel's inquiry into Officer Baker's report of an unidentified police officer who performed a field-test for marijuana on the drugs seized from Mr. Fleming." He maintains that: "Defense counsel sought to follow-up with Officer Baker as to general procedure for handling evidence and why the person who conducted the field-test was not identified; but he was precluded by the court." He states that "[t]he only plausible defense going into trial was to cast doubt on Officer Then's testimony that the drugs he seized appeared to be the drugs entered into evidence." The government argues that the trial court did not err in limiting the direct examination of Officer Baker by defense counsel. The trial court noted that after defense counsel elicited Officer Baker's acknowledgment that a field test had been conducted, so that it became clear that "one officer says [the field-test] was done and another officer says it was not," the usual procedures and who might have done the field-test were irrelevant and immaterial inquiries.[4]

"[A] decision on an issue of relevance is entrusted to the trial court's discretion, to which we owe substantial deference; we will overturn it only on a showing of abuse of discretion." *Stewart v. United States*, 881 A.2d 1100, 1110 (D.C. 2005) (citations omitted); *see also Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C. 1979). "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Stewart, supra*, 881 A.2d at 1110 (quoting *Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977)) (other citations and internal quotation marks omitted).

In our review of the direct examination of Officer Baker by defense counsel,

---

**4.** Defense counsel posed the following question to Officer Baker: "[D]id you write in the PD–251 that a portion of the weed field-test was negative for cannabis?" Officer Baker replied, "Yes." When defense counsel attempted to read further from the PD–251 while conducting his direct examination of Officer Baker, the trial court instructed him not to "lead" his witness by reading from the PD–251. Defense counsel then inquired: "Officer Baker, your testimony was that there was no field-test conducted, is that fair to say?" The officer answered: "Yes, it was." When defense counsel appeared ready to read again from the PD–251, the trial judge again directed him not to read from the document. When defense counsel persisted, the trial court sustained the government's objection and at a bench conference reminded defense counsel that he had "elicited there was no field-test[,] [a]nd then ... [had] impeached [Officer Baker] with the document[ ] in which he wrote there was a field-test." The judge added: "See, now, you have done what you set out to do and you cannot read further from the document." Defense counsel strongly disagreed with the judge, insisting

that he could lead his own witness when impeaching him. The judge advised that counsel "must be impeaching something [Officer Baker has] already said," and that he "may not lead." After the bench conference, defense counsel prepared to read from the PD–251, but the court interrupted him. Defense counsel established again that "the results or the tests were negative," that is "the results of a field-test," and that after reviewing his "paperwork," Officer Baker "remember[ed] there was a field-test." Defense counsel followed with questions about who conducted the field test, and elicited that Officer Baker did not have the name of the person who did the field-test. When defense counsel asked, "do you know why it is that the person who did the field-test is not identified?" the prosecutor objected on the grounds of relevance. The judge sustained the objection, but defense counsel inquired whether it was possible that Officer Baker did the test. The prosecutor objected on the ground that the question already had been asked and answered. After extensive discussion at the bench, defense counsel concluded his examination of Officer Baker.

and the trial court's rulings pertaining to that examination, we discern no abuse of discretion or trial court error. Defense counsel's questions related to a field test for marijuana, but Mr. Fleming was tried on a charge of unlawful possession with intent to distribute PCP. That a field test had been conducted to determine the presence of marijuana could not demonstrate, even remotely, that the substance removed from Mr. Fleming's person and analyzed by the DEA chemist probably was not PCP. Nor would responses to questions about the general procedure for handling evidence, or why the person who conducted a field test for marijuana was not identified, make it less probable that Mr. Fleming possessed the PCP with an intent to distribute it. Hence the trial court correctly indicated that the questions were irrelevant. *See Stewart, supra,* 881 A.2d at 1110. In addition, defense counsel repeatedly stated that he wished to impeach Officer Baker. Notably, Mr. Fleming had the opportunity to cross-examine and impeach Officer Baker when he testified as a government witness, and had a second opportunity to question him when he was presented as a defense witness. Moreover, as the trial judge pointed out more than once, defense counsel accomplished the goal of impeachment when he established that Officer Baker first said there was no field test of the drugs removed from Mr. Fleming, and then acknowledged, when confronted with his PD–251, that there had been a field test for marijuana. The PD–251, which reflected the inconsistency was introduced into evidence. But, this inconsistency about whether a field-test was conducted, by itself, could not make it less probable that the drugs admitted into evidence were the same as the substance in the plastic bag removed from Mr. Fleming's waist. In short, we are satisfied that the trial judge did not abuse her discretion in precluding

defense counsel from further exploring that impeachment.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*