**Bruce W. GILMORE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 93–CF–470.**

District of Columbia Court of Appeals.

Submitted June 9, 1998.

Decided Nov. 18, 1999.

David Carey Woll, Washington, DC, appointed by the court, was on the brief for appellant.

Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, and William F. Gould, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of threatening to damage the property of another, threatening to injure a person, possession of a Molotov cocktail, arson, and assault.[1] On appeal he contends (1) that the trial court erred in denying his motion to suppress a statement; (2) that the evidence was insufficient to support his conviction of arson; (3) that the trial court abused its discretion in admitting into evidence the bottle from which he made the Molotov cocktail; and (4) that the trial court erroneously instructed the jury on a witness' prior inconsistent statement. We reject all of these arguments and affirm all of the convictions.

I

This case arises from a series of five separate incidents that occurred between April and August 1992. We shall summarize the four that resulted in convictions.[2]

A. *The April 6 incident*

Michelle Holmes married appellant Gilmore in 1988. Although they did not get a divorce and were in fact still married at the time of trial, they had separated in December 1991, when Ms. Holmes and their three children left the marital home and moved in with other family members at 4426 New Hampshire Avenue, N.W. ("the Johnson house"). On April 6, 1992, Mr. Gilmore, Ms. Holmes, and two friends were sitting on the front porch of the

---

1. Appellant was also charged with eight other crimes: two additional counts of threatening to injure a person, one count of assault with a dangerous weapon, one count of assault with intent to kill, one additional count of possession of a Molotov cocktail, and three additional counts of arson. At the conclusion of the government's case, the trial court granted appellant's motion for judgment of acquittal on two of the arson counts and then merged the two remaining arson counts into one count. The jury found appellant guilty of five of the charges that were submitted to it, but acquitted him of the rest.

2. Because the jury acquitted appellant of all charges based on an incident occurring on July 9, we need not discuss it further.

Johnson house, drinking beer and talking. Mr. Gilmore became angry when Ms. Holmes' grandfather stepped onto the porch and "looked at him funny," so he took a baby's toy and "hit [Ms. Holmes] in the head as hard as he could, and then he pushed [her]." After Ms. Holmes pushed him back, he poured beer in her hair, threatened to blow up the house,[3] and threatened to beat up her grandfather. Ms. Holmes "was sure" that Mr. Gilmore would act on his threats.

### B. *The May 13–14 incidents*

The house next door at 4428 New Hampshire Avenue, where Clifford Smith lived with various family members ("the Smith house"), was physically connected to the Johnson house. On the night of May 13, 1992, Mr. Smith was sitting outside in front of another neighbor's house, talking with a few other persons; Gilmore was there also. After a few minutes' conversation, Mr. Gilmore and Mr. Smith's brother William got into a shoving match, and Gilmore threatened to kill both Clifford and William Smith because he said they were "messing around" with his wife. Gilmore then walked down the street and returned with a knife, which he swung at William Smith. Before he could hurt anyone, however, another man "snatched the knife out of his hand and threw it away ... across the street," where it was found by the police later that night. Clifford Smith went back inside his house and asked someone (not further identified) to call the police. Gilmore fled when the police arrived.

About two hours later, someone knocked on the door of the Smith house. Clifford Smith testified:

I went and answered the door, and I opened it. He [Gilmore] had knocked on the door and went down to the bottom of the steps, and he had a cocktail bottle cocked back and [said that] he was going to fuck me up, excuse my language, that he [was] going to mess

me up, and was going to kill me, he [was] going to burn the house down.

Mr. Smith described the bottle as "a bottle of gasoline with the stem hanging out the top of it." Then, as Gilmore attempted to light it with a cigarette lighter, Smith told him the police were coming, whereupon Gilmore "grabbed the bottle and just ran up the street." Later, however, he returned to the Smith house with a second bottle similar to the first. Gilmore lit the wick and tried to throw the bottle toward the Smith house, but it slipped from his hand and fell to the ground approximately fifteen or twenty feet short of its target. During this second encounter, Mr. Gilmore threatened to kill Ms. Holmes, who was standing on her porch next door, as well as Charles and William Smith; he also said he was going to burn down both of their houses.

Clifford Smith's testimony was corroborated by three other witnesses. William Smith said that while he and some friends were sitting outside drinking, Gilmore "started to jump up and threaten [him]" and accused him of sleeping with his wife. William Smith eventually punched Gilmore on the chin, whereupon Gilmore "ran to the car and got ... a knife." With the knife in his hand, Gilmore approached Smith and threatened to kill both him and Clifford Smith. Later that night, William Smith saw Gilmore approaching their house with a lighted bottle in his hand, threatening to kill them both and to blow up their house. William Smith went inside and called the police. Michelle Holmes testified that she saw Gilmore "coming down the street with ... cocktail bombs in his arms." He "was throwing them, but they slipped," and he was yelling. Finally, Officer James Castellano of the Metropolitan Police testified that at approximately 2:00 a.m. he went to 4428 New Hampshire Avenue, where he "took a report for threats." About an hour later, he was called back to the same house, where he

---

3. This was the basis of Gilmore's conviction of threats to damage the property of another.

saw an orange juice bottle on the ground in front of the house, on fire. On closer inspection he saw that the bottle was "filled with some kind of liquid." When Officer Castellano kicked the bottle, it broke, and the liquid burned itself out on the sidewalk.[4]

William Kinard, a forensic chemist with the Bureau of Alcohol, Tobacco, and Firearms (ATF), was accepted as an expert in the area of forensic chemistry. He testified that he performed a chemical analysis on what was left of the bottle and found gasoline on it. James Powell, an ATF explosives enforcement officer, testified as an expert on explosives and incendiary devices. He described a Molotov cocktail as "a breakable container containing flammable liquid with some sort of wick, or something to ignite the flammable liquid."

### C. The August 12 incident

Michelle Holmes testified that on August 12, 1992, she and her mother were sitting in front of their house, talking, when Mr. Gilmore "came about in his car, yelling and screaming ... that he was going to kill me." Gilmore then left, and Ms. Holmes went inside, but he soon returned and "was banging on the door" and again threatening to kill her. Holmes called the police, who "took him away," but he came back again later and drove past the house, and then kept calling her on the telephone "all night." Latisha Gilmore, the daughter of Mr. Gilmore and Ms. Holmes, testified that she was in the kitchen that night when her father knocked on the door. The knock, she said, "sound[ed] like a pole or a hammer." Although she heard her father talking, she did not hear what he said.

William Smith testified that on August 12, shortly after 10:30 p.m., he was in front of his house, putting away his bicycle, when Gilmore "pulled up with his car and

he started making threats, I know you're sleeping with my wife, I know you're having sex with my wife, and all of this ...." Gilmore then got out of his car, "grabbed something out of the car, and approached to come across the street," so Smith left the bicycle on the front porch and went next door to the Johnson house. As he sat on the porch with Ms. Holmes and her mother, Gilmore "kept like going in every direction of New Hampshire Avenue, changing clothes, threatening, coming back like he had weapons and stuff, saying that he was going to shoot me ...." Once again the police were called, and when they arrived, Gilmore "was standing in front of Michelle's house with an iron black pipe ... hitting with it in his hand." The police placed him under arrest, but he was evidently released the same night, because he began again to make threatening phone calls.[5]

### D. The August 14 incident

Anthony Davis testified that on August 14, 1992, he was waiting for a bus at the Fort Totten Metro station when he heard "a lot of bickering and fussing." He turned and saw Mr. Gilmore grab a woman from behind and pull her right arm so that the bags she was carrying fell to the ground. The woman cried out, "Let me go," but Gilmore "maintained a hold on her." Davis reported the incident to the station manager, and within minutes the police arrived and arrested Gilmore.

Michelle Holmes testified that she was on her way home from work on August 14 when she encountered Mr. Gilmore, who was standing just outside the Fort Totten Metro station. She walked past him, but he followed her, pulled her arm, "threw [her] bag down," and started to choke her. She struggled, hitting him with her purse, and eventually managed to break free. A

---

4. This incident served as the basis for the convictions of arson and possession of a Molotov cocktail.

5. On the basis of this incident, Gilmore was convicted of threatening to injure Michelle Holmes.

police officer arrived and "locked him up, put him in the car." [6]

### E. *The defense evidence*

Three witnesses testified for the defense. Frances Thomas, a medical records librarian for the District of Columbia Department of Corrections, identified a medical record relating to Mr. Gilmore, dated August 15, 1992, which had been prepared by a physician at the jail clinic. George Bonebrake, a private fingerprint consultant who testified as an expert in latent fingerprint analysis, stated that there were no identifiable fingerprints on the knife that Mr. Gilmore allegedly used to threaten William Smith on May 13.

Thomas Worthington, an acquaintance of both Mr. Gilmore and Ms. Holmes, testified as follows about a conversation he had with Ms. Holmes in November 1992 in the hallway of the courthouse:

> [She] wasn't that forthcoming with information in reference to what the offense was that Mr. Gilmore was charged with. She was so adamantly opposed to him seeing the light of day as far as she's concerned. She just said she wanted to make sure this time he got as much time … as he can get …. And I said … that's the judge's decision. She said, well, I hope she don't ever let him out. I hope he'll never get out of jail.

Ms. Holmes had previously denied making such statements.

## II

### A. *The suppression hearing*

Gilmore filed a motion to suppress certain statements he made to a police officer following his arrest on a warrant on June 4, 1992.[7] At the hearing on that motion, Detective Everett Campbell testified that he processed Mr. Gilmore after he was arrested and advised him of his *Miranda*[8]

rights by reading them to him from a PD–47 card. Mr. Gilmore signed the card and said he wanted to make statements only with his attorney present. Nevertheless, immediately after signing the card, Gilmore began talking spontaneously, asking what the charges against him were and what a Molotov cocktail was. In addition:

> He mentioned that on the evening of this offense, he had been intoxicated, and during this period he was assaulted by two men. He said that he had gotten this Molotov cocktail to defend himself from these two people who had assaulted him. He said that he had no intention of throwing it into any house or using it against anyone other than to protect himself against these two men.

Gilmore also said that the Molotov cocktail had only "a small amount of gasoline in the bottle." On cross-examination, Detective Campbell stated that he was "almost certain" that he did not ask Gilmore what was in the bottle because he "knew there was no problem with the contents of the bottle."

During his direct examination Campbell said, "Mr. Gilmore asked a lot of questions, and I tried to answer most of them." Although "[c]ertainly during that time I had to have asked him one question or something," Campbell could not remember what that "one question" might have been. He did recall, however, that Gilmore did not specifically respond to any questions he asked. Campbell continued:

> Q. Did you ever ask him to explain the incident?
>
> A. I didn't have to. He mentioned he was intoxicated. He also said that if he did it, he didn't have a recollection of doing it. He said that early on in this period.

---

**6.** The assault conviction was based on this incident.

**7.** The warrant was based on the May 14 Molotov cocktail incident.

**8.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Campbell testified that even though Gilmore had said earlier that he did not want to make any statements without an attorney present, at no time did he stop talking and request an attorney. Eventually, however, he did phone an attorney, who instructed him not to make any more statements. After that, Campbell asked him only about "work history, family history, whether or not he had a record." When Campbell brought Gilmore back to the cell block after completing the necessary paperwork, Gilmore was still talking, saying "the same kinds of things."

The court denied the motion to suppress, finding that Mr. Gilmore's *Miranda* rights were not violated because Detective Campbell did not interrogate him. "The only version of the facts we have is that the detective did not initiate any questioning but simply answered his questions that he was continuously asking, and that possibly during the course of answering questions may have asked a follow-up question, but that it was not a police interrogation." As for Campbell's testimony that he did ask Gilmore some questions, the court accepted Campbell's explanation

> that there were certain questions he knows he asked, necessary to get the identifying information for the booking questions, basically, and that he may have asked sort of a follow-up question during Mr. Gilmore's constant talking and questioning of him, but ... he was quite clear, and I find, that he did not initiate any questioning about the offense, and I have heard no contrary testimony.

The only statement introduced into evidence at trial was Gilmore's remark to Detective Campbell that "he had a bottle with a small amount of gasoline in it."

### B. *Was there a Miranda violation?*

■ Appellant contends that the trial court erred in denying his motion to suppress because "it is clear that [he] had his lawyer and wanted to get in touch with him before any interrogation would begin"

and that "Detective Campbell admitted that he interrogated appellant." In *Miranda v. Arizona, supra* note 8, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. 1602. Such safeguards require that the defendant be informed of his Fifth Amendment right to have an attorney present during interrogation. If the defendant invokes that right, no further questions may be asked without an attorney present "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *see Michigan v. Mosley,* 423 U.S. 96, 99, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Townsend v. United States,* 512 A.2d 994, 1001 (D.C.1986), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2188, 95 L.Ed.2d 843 (1987). However, "custodial interrogation" is limited to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

It is uncontested that Mr. Gilmore invoked his Sixth Amendment right to have an attorney present during questioning. In addition, the record is clear that Mr. Gilmore was under arrest—and thus in custody—at the time he made his statements. The only issue for us to consider, therefore, is whether the statements were the product of police interrogation. That issue involves questions of both fact and law.

■ The trial court's factual findings—that Mr. Gilmore voluntarily initiated the discussion with Detective Campbell and that Campbell did not question him about the offense with which he was charged—may not be disturbed unless they are plainly wrong or without support

in the evidence. D.C.Code § 17–305(a) (1997); *see, e.g., Stewart v. United States,* 668 A.2d 857, 863 (D.C.1995). We are fully satisfied that such support exists in the record. The only evidence presented at the suppression hearing was the testimony of Detective Campbell. He said that Gilmore began talking spontaneously and asking questions very soon after he was advised of his *Miranda* rights and invoked his right to counsel. Campbell testified that he tried to answer most of Gilmore's questions and, in the course of doing so, "had to have asked him one question or something." He could not remember what that "one question" might have been, but he did state that, whatever it was, Gilmore did not respond to it. Detective Campbell was "almost certain" that he did not ask Gilmore about the contents of the bottle from which he made the Molotov cocktail because Campbell already "knew what was in it." The trial court, finding Detective Campbell to be credible, found that Gilmore had spontaneously volunteered his inculpatory statements and that Detective Campbell did not ask him specific questions about the offense. Because Detective Campbell's testimony was uncontroverted and was not on its face inherently incredible, we readily sustain the trial court's findings of fact.

 The court's ultimate ruling that Detective Campbell's conduct did not constitute interrogation is a conclusion of law that we review *de novo. See, e.g., Davis v. United States,* 564 A.2d 31, 34–42 (D.C. 1989) (en banc); *Derrington v. United States,* 488 A.2d 1314, 1327–1328 (D.C. 1985). We sustain that ruling as well. The Supreme Court has defined interrogation for *Miranda* purposes in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> [T]he term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 301, 100 S.Ct. 1682 (footnotes omitted); *see Spann v. United States,* 551 A.2d 1347, 1349 (D.C.1988); *United States v. Alexander,* 428 A.2d 42, 51 (D.C.1981). It is well established that questioning initiated by the accused is not interrogation in the *Innis* sense. *Edwards v. Arizona,* 451 U.S. at 484, 101 S.Ct. 1880. At the very least, the police must have asked a question that was "probing, accusatory, or likely to elicit an incriminating response" before a court may conclude that there was interrogation. *Hairston v. United States,* 500 A.2d 994, 997 (D.C.1985). Moreover, any administrative questions that Detective Campbell may have asked in order to process Mr. Gilmore did not constitute interrogation; at least, that is what Campbell's testimony shows, and there is nothing in the record to suggest otherwise. This court has held that routine booking questions are not interrogation for *Miranda* purposes. *Thomas v. United States,* 731 A.2d 415, 421 (D.C.1999) (citing *Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (plurality opinion), and noting that "the routine booking question exception has been uniformly recognized since *Muniz* by the federal and state courts"). Therefore, given the trial court's findings that Mr. Gilmore initiated all discussion with Detective Campbell and that Campbell asked only routine booking questions, we hold that the court did not err in concluding that Gilmore's *Miranda* rights were not violated because he was never subjected to interrogation.

### III

In denying a post-trial motion for judgment of acquittal or, in the alternative, for a new trial, the trial court said in its order:

> Defendant argues that his conviction for arson should be set aside because the bottle allegedly thrown by him did not land at a building or curtilage thereto. He ignores the eyewitness testimo-

ny that after he lit one of the Molotov cocktails, it slipped out of his grasp as he attempted to throw it at the buildings. Officer Castellano saw a bottle on fire in front of the houses and kicked it, causing his own pants to catch on fire. Although the only Molotov cocktail recovered by the police was on a public sidewalk, a reasonable jury could conclude that trying to throw a burning bottle towards a house during an argument with its occupant constitutes an attempt to burn the house under D.C.Code § 22–401.

Gilmore contends that this ruling was erroneous and that the evidence was insufficient to support his conviction of arson. We cannot agree.

To establish that Gilmore committed the crime of arson, the government had to prove the malicious burning or attempted burning[9] of the dwelling of another person. "Arson ... involves conduct endangering human life and offending the security of habitation or occupancy." *Logan v. United States*, 460 A.2d 34, 38 (D.C. 1983) (citation omitted). In this case there was evidence that on May 14 Mr. Gilmore stood in front of the Smith and Johnson houses with a Molotov cocktail, lit the wick, and attempted to throw it at the Smith house. Clifford Smith testified that Gilmore, after threatening to "kill me ... [and] burn the house down," ran away when Smith told him that the police were coming. A short time later, however, Gilmore came back with another bottle similar to the first bottle. He lit the wick and "made an attempt to throw the bottle, [but] it slipped out of his hand to the grass" and landed, still lit, fifteen to twenty feet from the house. William Smith saw Gilmore approaching the house "lighting a bottle with a newspaper with a match." Michelle Holmes said that she saw Gilmore approaching with "cocktail bombs in his arms." Officer Castellano testified that he arrived at the Smith house and found a glass bottle on fire on the ground in front of the house. In addition, there was testimony that Mr. Gilmore had repeatedly threatened to "blow up" and "burn down" both the Smith and the Johnson houses. *See Russell v. United States*, 701 A.2d 1093, 1098 (D.C.1997) (considering "evidence of two conversations linking [the defendant] to the potential use of Molotov cocktails" in holding that evidence was sufficient to sustain arson conviction). On this evidence, we hold that a reasonable juror could find that Mr. Gilmore attempted to burn the Smith house, and hence that the trial court did not err in denying his several motions for judgment of acquittal on the arson charge.

## IV

Officer Edward Payne, a crime scene search officer, recovered what was left of the orange juice bottle from the sidewalk in front of 4428 New Hampshire Avenue. He placed the bottle in a five-gallon paint can, on which he wrote the address of the recovery site and the date. He then took the can to his office and put it in his evidence locker. Approximately eight months later (two months before trial), he found the can in his locker, with the bottle still in it, and recognized it as evidence in this case. In the interim, Officer Payne had thought he had thrown the can away,[10]

---

9. The arson statute proscribes, *inter alia*, not only the actual burning but the attempted burning of someone else's home:

> Whoever shall maliciously burn or attempt to burn any dwelling, or house ... the property, in whole or in part, of another person ... shall suffer imprisonment for not less than one year nor more than ten years.

D.C.Code § 22–401 (1996).

10. Because the bottle contained only a small amount of gasoline after being knocked over by Officer Castellano, Officer Payne believed that he could not run tests on it, and therefore he put it in his locker and forgot about it. He apparently told the prosecutor that he had destroyed both the can and the bottle. At a hearing three months before trial, the prosecutor told the court that Officer Payne had told her he had taken photographs of the bottle because he believed that the bottle itself

but in fact he had not moved it or touched it, and it still looked the same as it did when he put it in the locker.[11] Upon discovering it, he promptly sent it to the ATF laboratory for testing. At trial Officer Payne identified the paint can by the address and date he had written on it. On cross-examination defense counsel tried to get Payne to say that the bottle that had just been marked as an exhibit was a different bottle, but the officer consistently stated that it was the same bottle he had recovered at the scene of the crime on May 14.

Jackie Herndon, an ATF special agent, testified that in January 1993, approximately two weeks before trial, she picked up a can from the Fourth District evidence room and transported it to the ATF laboratory for testing. William Kinard, a forensic chemist employed by ATF, stated that Agent Herndon brought a can containing a broken bottle to the ATF laboratory for analysis. After performing certain tests, Kinard found traces of gasoline on the bottle.

Immediately after Officer Payne left the witness stand, defense counsel moved for a mistrial on the ground that Officer Payne had destroyed the actual bottle and subsequently manufactured the bottle and paint can which had been marked and shown to the jury. The court denied the motion. Later, at the close of the government's case, defense counsel objected to the admission of the bottle and the paint can into evidence, but the court admitted them over his objection.

Gilmore contends that the trial court should not have allowed the bottle and paint can into evidence because the chain of custody had been broken. He states in his brief that Officer Payne "[o]n at least four occasions ... failed to bring the bottle

to court for proceedings in this case. Obviously, he couldn't account for the whereabouts of the bottle and was upbraided by the prosecutor for throwing it away." Gilmore implies that Officer Payne, contrary to his testimony, actually discarded the bottle, was scolded by the prosecutor for doing to, and then manufactured a replacement. There is no support in the record for any such assertion.

■■■■ The trial court has broad discretion in determining the admissibility of physical evidence. *E.g., Ford v. United States*, 396 A.2d 191, 194 (D.C.1978) (citing cases). In exercising that discretion, the court "must be satisfied that 'in reasonable probability the article has not been changed in important aspects.'" *Id.* (citations omitted). "This determination is made in light of the 'nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it.'" *Id.* (citation omitted). If the evidence has been in the possession of government officials charged with its safekeeping, the trial court may properly assume that the chain of custody was proper unless there is evidence of tampering. *Id.; accord, e.g., Spencer v. District of Columbia*, 615 A.2d 586, 589 (D.C.1992). At that point, the burden is on the defendant "to introduce evidence that the routine handling of the evidence by the government did not suitably preserve [it] ... by making 'a minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering.'" *German v. United States*, 525 A.2d 596, 610 (D.C.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987) (citing *United States v. Lane*, 192 U.S.App. D.C. 352, 353, 591 F.2d 961, 962 (1979)).

In the case at bar, the government presented evidence that Officer Payne, whom the trial court found to be a credible wit-

was of no value: "[T]here was not enough gasoline sample inside ... it was not even worthy of an analysis." At that point the officer had not yet found the bottle and paint can in his evidence locker and still believed he had thrown them both away.

11. The lid of the can was "just like a paint can ... pressed down on the top ... [and] airtight."

ness, collected the bottle from the crime scene, placed it in a paint can, and wrote the date and the address of the recovery site on the can. He took the can back to his office and placed it in his evidence locker, then apparently forgot that he had put it there and assumed he had thrown it away. However, approximately one month before the trial started—eight months after the bottle was originally recovered— Officer Payne found the paint can while cleaning out his locker. At trial he identified the paint can that was offered in evidence as the same one he had put in his locker by the date and the address that he had written on the can. He testified that he did not see the can in the eight months prior to its rediscovery.

■■■ Officer Payne's handling of the bottle was plainly careless and not to be emulated, but he nevertheless was able to account for its whereabouts during the entire time period in which it was "missing." *See Turney v. United States,* 626 A.2d 872, 875 (D.C.1993). Nor was there any showing by the defense that Payne (or anyone else) had tampered with the bottle. Defense counsel insinuated through his cross-examination that Officer Payne had altered the bottle or substituted another bottle for it, but Payne steadfastly denied it, and the defense offered no actual evidence that the bottle had been altered or misidentified. We hold, therefore, that the defense did not meet its burden under *German* and similar cases, and that the trial court did not abuse its discretion in ruling that the chain of custody was unbroken.

### V

During his closing argument, defense counsel made the following statements:

If you're going to convict Mr. Gilmore of what happened on August 12th, you're going to have to believe ... Mrs. Gilmore. The same Mrs. Gilmore who told Tom Worthington outside this courtroom, the first trial date we had in this case, that she wanted to put him

away forever. She hoped the Judge gave him as much time—

The prosecutor objected at this point, and the court sustained the objection and instructed the jury, "[T]he only use you can make of any statement made outside of the courtroom is in evaluating statements made inside the courtroom. Any allegation of something said outside the courtroom is not substantive evidence and cannot be treated as evidence." Defense counsel then said to the jury:

Ladies and gentlemen, you can use what Mrs. Gilmore said to Mr. Worthington on November 2nd to determine whether she was telling the truth, the whole truth, and nothing but the truth from the other times she testified in this trial. You can use those words that you heard Mr. Worthington repeat. You can use those words to decide whether the rest of her testimony is true.

The court interjected and said:

That's not true either.... The witness not having said those things, you can use Mr. Worthington's testimony solely to determine whether or not you believe her denial of having said those things.

There is no evidence in this case that they can consider those things true or not. The out-of-court statements repeated by Mr. Worthington are not evidence in this case. They're only impeachment of her version of that conversation.

Defense counsel did not object to the court's remarks but continued his closing argument, stating, "Well, ladies and gentlemen, you can use those words to determine Mrs. Gilmore's credibility, and I ask you to listen to the Judge when she instructs you on how to assess the credibility of a witness."

During its final instructions, the court told the jury:

The testimony of a witness may be discredited or impeached by showing

that he or she had previously made statements which are inconsistent with his or her present testimony. Such prior statements are admitted into evidence solely for your consideration in evaluating the credibility of the witness in court.

Should you find the prior statement to be inconsistent, you may consider such statement only in connection with your evaluation of the truth of the witness' present testimony in court. You must not consider the prior statement as establishing the truth of any fact contained in that prior out-of-court statement.

Defense counsel did not object to this instruction.

Gilmore now contends that the testimony of Mr. Worthington was offered to show bias on the part of Ms. Holmes, and that the trial court erred in telling the jury that it could be considered only as a prior inconsistent statement for impeachment purposes. Unfortunately, defense counsel did not argue the point to the trial court in these terms,[12] and as a result the court understood counsel to be asserting that Worthington's testimony should be considered as a prior inconsistent statement by Ms. Holmes that she was biased against Mr. Gilmore (contrary to her own testimony that she never told Worthington any such thing). That was apparently the reason why the court instructed the jury on how it should evaluate prior inconsistent statements, which are of course hearsay but admissible for impeachment purposes under a well-recognized exception to the hearsay rule.[13] Now, on appeal, Gilmore contends that the court committed error in refusing to allow his counsel to argue to the jury that Ms. Holmes was biased against Mr. Gilmore—even though counsel never used the word "bias" in the argument that the court curtailed.[14]

■ We conclude that we need not decide whether the court erred in cutting off defense counsel's argument to the jury, because we are satisfied that any possible error was harmless under either *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), or the more stringent test of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Ms. Holmes' hostility to Mr. Gilmore was obvious throughout the trial, so that counsel's argument would not have had any appreciable effect on the jury or its verdict. Furthermore, although Ms. Holmes was an important witness against Mr. Gilmore, she was certainly not the only one; Clifford Smith, William Smith, and Anthony Davis, in particular, corroborated her testimony in significant ways. In light of the record as a whole, we see "no realistic possibility that the verdict would have been different" if counsel had been allowed to continue his argument to the jury without judicial intervention. *See Jordan v. United States*, 722 A.2d 1257, 1262 (D.C.1998), *cert. de-*

12. Appellant is represented by new counsel on appeal.

13. The instruction the court gave was correct at the time it was given. *See, e.g., Hill v. United States*, 664 A.2d 347, 351 n. 7 (D.C. 1995), *cert. denied*, 516 U.S. 1065, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996) ("prior inconsistent statements were not admissible as substantive evidence but only to contest credibility"); *Brewer v. United States*, 609 A.2d 1140, 1141 (D.C.1992); *Turner v. United States*, 443 A.2d 542, 549 (D.C.1982). Legislation enacted after this case was tried has made prior inconsistent statements admissible as substantive evidence under certain circumstances, but only if they were "given under oath," which was not the case here. *See* D.C.Code § 14–102(b) (1999 Supp.); *see also* FED. R. EVID. 801(d)(1)(A).

14. We agree with Gilmore that "the bias of a witness is always relevant to that witness' credibility." *Hollingsworth v. United States*, 531 A.2d 973, 979 (D.C.1987) (citations omitted). We note also, however, that a trial court has "wide latitude ... to impose reasonable limits" on cross-examination designed to expose bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Gilmore makes no contention here that he was hindered in his cross-examination of Ms. Holmes.

*nied,* —— U.S. ——, 119 S.Ct. 1276, 143 L.Ed.2d 369 (1999).

## VI

The judgment of conviction is therefore *Affirmed.*