EASTERLY, Associate Judge,
concurring:
The majority opinion does not decide whether the trial court abused its discretion in admitting the proffered ballistics material and relies on a harmless error analysis to resolve that challenge to Mr. Wonson’s convictions. It is clear, however, that the government did not provide the trial court with the requisite foundation to admit this ballistics material. . That the government repeatedly sought admission of this evidence in the absence of adequate foundation, and ultimately succeeded, reveals a need to review the admissibility requirements for tangible items that the government proffers as inculpating a defendant in the commission of a crime.
“It is generally recognized that tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense.” (Dawayne) Brooks v. United States, 717 A.2d 323, 328 (D.C.1998) (quoting Gass v. United States, 416 F.2d 767, 770 n. 8 (D.C.Cir.1969)); see generally 2 MoCor-mick on Evidence § 213 (7th ed.2013) [hereinafter 2 MoCormick on Evid. § 213] (providing background on chain of custody). A trial court has “broad discretion” when deciding whether to admit physical evidence. Plummer, 43 A.3d at 272. But before a court may admit tangible items proffered by the government, the government must address two related concerns.
First, the government must establish that the objects are genuine — i.e., that the proffered evidence is what the government says it is.[1] See Plummer, 43 A.3d at 272 *70 (stating that to establish admissibility, the government must prove that objects “offered into evidence at trial were the same ones the police seized from appellant”); see also Turney v. United States, 626 A.2d 872, 873 (D.C.1993) (explaining that, to move into evidence fungible objects, such as illegal drugs, the government must prove that the objects are the same as those seized from the defendant); accord Fleming v. United States, 923 A.2d 830, 836 (D.C.2007); Stewart v. United States, 881 A.2d 1100, 1115 (D.C.2005).
Second, the government must establish the integrity of the evidence — i.e., that the evidence has not changed in material ways. See Ford v. United States, 396 A.2d 191, 194 (D.C.1978) (a trial court “must be satisfied” that an article the government seeks to move into evidence “has not been changed in important aspects” (quoting United States v. S.B. Penick & Co., 136 F.2d 413, 415 (2d Cir.1943))); accord Fleming, 923 A.2d at 836; Gilmore v. United States, 742 A.2d 862, 871 (D.C.1999). “This determination is made in light of the ‘nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it.’ ” Gilmore, 742 A.2d at 871 (quoting Ford, 396 A.2d at 194).
The government may satisfy these dual concerns by establishing an unbroken chain of custody. Once it does so, courts afford the government the benefit of “an evidentiary presumption” that it properly handles and suitably preserves the evidence over which it maintains continuous custody and control. Plummer, 43 A.3d at 272 (“[Wjhen physical evidence is in the hands of the government, the presumption arises that it has been handled properly.” (quoting In re D.S., 747 A.2d 1182, 1187 (D.C.2000))); Brooks, 717 A.2d at 328 (“[Wjhen the item has been in the possession of government officials charged with its keeping, the court may assume ... that the officials properly discharged their duties.” (quoting Ford, 396 A.2d at 194)).[2] At this point, the burden shifts to the defendant to rebut the presumption by showing that the evidence was not genuine or that its integrity was somehow compromised. See Fleming, 923 A.2d at 837 (citing Turney, 626 A.2d at 874, and Gilmore, 742 A.2d at 871); Ford, 396 A.2d at 195.
To gain the benefit of this presumption and its burden-shifting framework, the government must establish an unbroken chain of custody by a “reasonable probability.” Plummer, 43 A.3d at 272. Absent proof by a reasonable probability that challenged evidence was in the government’s continuous custody and control, the trial court generally must exclude the proffered evidence.[3] See Turney, 626 A.2d at 874-75 (citing cases in which courts determined that “the chain of custody [was] insufficiently proved” and consequently that the proffered objects should not have *71 been admitted into evidence); Novak v. District of Columbia, 160 F.2d 588, 589 (D.C.Cir.1947) (reversing conviction because the evidence was “missing a necessary link in the chain of identification” (footnote omitted) (emphasis added)).[4] Cf. United States v. Mejia, 597 F.3d 1329, 1336 (D.C.Cir.2010) (“A break in the chain of custody ... can be serious enough that the [trial] court may abuse its discretion in admitting the evidence.”).
In its brief to this court, the government argues that a break in the chain of custody affects “only” the weight of the evidence, not its admissibility. This is incorrect. It is true that, “normally,” the government establishes a chain of custody by a reasonable probability, and whatever imperfections remain “go to the weight of the evidence rather than its admissibility.” (Herbert) Brooks v. United States, 993 A.2d 1090, 1094 (D.C.2010) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n. 1, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)). After all, the government may be able to prove an unbroken chain of custody by a reasonable probability but unable to satisfy a higher standard of proof Thus, in Plummer, this court explained that, because the government had presented sufficient evidence that it had maintained continuous custody and control over the physical evidence in question, “[a]ppellant’s chain of custody concerns therefore go not to the admissibility of the evidence, but instead to the weight .that it could be given.” 43 A.3d at 273 (emphasis added). The clear implication of Plum-mer — which aligns with the other decisions binding on this court discussed above and with the MPD’s understanding of the import of chain of custody[5] — is that a failure to present sufficient evidence of chain of custody can implicate admissibility.[6] Indeed, if the government were correct and breaks in the chain of custody could not affect admissibility, then the trial court should not have considered the chain of custody when deciding whether to ad *72 mit the ballistics material. And this court presumably would have long ago eschewed appellate review of challenges to the admission of the government’s evidence on this basis. That we have instead continued to entertain arguments for reversal based on the government’s failure to prove an unbroken chain of custody (as we do in this case) refutes the government’s argument.
Turning to the particular facts of this case, the government clearly failed to establish by a reasonable probability that it had maintained an unbroken chain of custody over the proffered ballistics material. To be sure, the government presented evidence that Mr. Turner collected cartridge cases and a live round of ammunition from the scene of the shooting. And it presented evidence that ballistics material was later examined and engraved by the firearms and toolmark examiner, Mr. Mulder-ig. But between those events there was an evidentiary void. This void precluded a determination by a reasonable probability that the government maintained continuous custody and control of this ballistics material prior to trial and in fact suggests that the government lost track of it entirely for a period of time after its collection and before its examination.
Notably the trial court admitted the ballistics material after hearing relevant testimony from only Mr. Turner. But Mr. Turner did not provide information sufficient to support a determination by a reasonable probability that the government maintained continuous custody and control over these items.[7] He was able to provide information about the collection of the ballistics material at the scene of the shooting. But his knowledge of what happened to these items ended when his supervisor, Mr. Hammett, took possession of them. Moreover, Mr. Turner’s testimony about the standard protocol for keeping track of objects collected from a crime scene simply put in relief the absence of any proof that such protocols were followed in this case. In particular, Mr. Turner testified that crime scene materials should be “placed on a mobile crime property book” and indicated that information regarding the transfer of such materials from one department of MPD to another, e.g., from the mobile crime lab to the firearms examination section, should be reflected in that book.[8] But he could not say that anyone in the MPD had recorded the collection and transfer of the cartridge cases and live round in this case, and the government did not offer the property log as an exhibit or present other evidence suggesting that the *73 ballistics material was documented or tracked in this manner.
In ruling that the ballistics material was admissible after hearing Mr. Turner’s testimony, the trial court determined it was sufficient that these items had, at some point, been “stored in a police property office,” because “the presumption here” is that the office “preserve[s] the property.” But the trial court overlooked the government’s failure to present any evidence explaining when the police property office took possession of the ballistics material or how the material got there. n Cf. Gilmore v. United States, 742 A.2d 862, 872 (D.C.1999) (holding that the trial court did not abuse its discretion by rejecting a defendant’s chain of custody challenge, despite an officer’s “plainly careless” handling of an object recovered from the crime scene and his inability to locate the object for eight months, because the officer eventually found the object in his evidence locker and “was able to account for its whereabouts during the entire time period”). Effectively, the trial court' gave the government the benefit of a double presumption: it presumed both that the government maintained continuous custody and control over the ballistics material and that it properly handled and preserved these items. By presuming too much, the trial court relieved the government of its burden of establishing the admissibility of the proffered evidence.
As a coda to the above analysis, it should be noted that the admission of the ballistics material was not contingent on the government’s subsequent presentation of other chain-of-custody evidence. But even if it had been, none was forthcoming. To the contrary, the missing links in the government’s chain of custody were revealed more starkly. Because the ballistics material was last seen in the possession of Mr. Hammett, the government needed to explain what Mr. Hammett did with it. But to avoid a damaging cross-examination about Mr. Hammett’s termination for mislabeling and mishandling evidence, the government opted not to forge the next link in the chain by calling Mr. Hammett to testify. Nor did the government present testimony from any witness who had obtained the ballistics material from Mr. Hammett. And again, the government did not present the property book or any other documentary evidence from which the journey of these objects could be traced.
Instead, the government presented the testimony of Mr. Mulderig, who testified that he examined some ballistics material in “[ajpproximately June of 2000.” See supra note 19. Mr. Mulderig said nothing about where these items came from (because the government never asked him). The only certainty is that Mr. Mulderig did not get these items from Mr. Hammett. Mr. Mulderig’s report notes that the cartridge cases and the live round of ammunition were “personally delivered” by “Technician Elizabeth Sharp-Hamlet” on the day after the shooting. But Ms. Sharp-Hamlet’s role in the investigation is a complete unknown: she did not testify, no witness mentioned her, and her name is absent from every other document admitted at trial. Thus, there is no way to discern from this record who she was, where she obtained the ballistics material from, or whom she “personally delivered” it to.
In sum, whether one starts with Mr. Turner’s collection of ballistics material and moves forward to Mr. Hammett, or whether one works backward from Mr. Mulderig’s receipt of ballistics material from Ms. Sharp-Hamlet, one reaches a point where one cannot connect the dots— a point where one must conclude that the government’s chain of custody was simply “insufficiently proved.” Turney, 626 A.2d *74 at 874. To provide sufficient proof, the government need not “call to the stand every witness who may have handled a piece of evidence,” Mejia, 597 F.3d at 1336 n. 4, but it must construct a foundation far stronger than the one in this case. Given the clear break in the chain of custody, the trial court abused its discretion by admitting the proffered ballistics material.[9]

. Demonstrating that an object is what a party says it is may also be referred to as establishing "authenticity,” but that term can also have broader meaning. See 2 McCormick on Evid. § 213 (explaining that "authentication” of non-unique crime scene evidence may require proof both that it was found at the crime scene and that the object "has neither *70 been exchanged nor altered” "from the moment it was found to its appearance in the courtroom”). Moreover, "authenticity” risks confusion with Federal Rule of Evidence 901, which this court has not adopted. See supra note 17.

. See also 2 McCormick on Evid. § 213 (explaining that to establish the admissibility of physical evidence, the proponent typically "traces the chain of custody of the item from the moment it was found to its appearance in the courtroom, with sufficient completeness to render it reasonably probable that the original item has neither been exchanged nor altered”).

. As a practical matter, the government’s inability to demonstrate an unbroken chain of custody by a reasonable probability may result in the exclusion of its proffered evidence. But the government may still seek to establish the genuineness and integrity of the evidence directly. See infra note 9.

. Novak is binding on this court. See M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C.1971).

. In its general order addressing the collection of physical evidence, the MPD acknowledges that "[t]he admissibility of evidence in a court of law will depend, in large part, on the manner in which the evidence was collected, and the precautions taken to ensure its integrity.” Metropolitan Police Department, General Order No. 304.08, Collection of Physical Evidence; Utilization of the Crime Scene Examination Section and Crime Scene Search Officers at 4 (April 30, 1992), https ://go.mpdconline. com/GO/GO_304_08.pdf (emphasis added) [hereinafter MPD General Order 304.08].

. Isolated sentences in this court’s opinions in Hammond v. United States, 77 A.3d 964, 970 (D.C.2013), Garcia v. United States, 897 A.2d 796, 801 (D.C.2006), and In re D.S., 747 A.2d 1182, 1187 (D.C.2000), superficially support the government's argument because these sentences omit the critical qualifier, employed by the Supreme Court and endorsed by this court, that chain of custody deficiencies "normally” go to the weight of the proffered evidence. But far from exposing substantive conflict within our precedent, it appears this omission is attributable solely to inexact citation.
Indeed, for the proposition that a break in the chain of custody affects only weight not admissibility, Hammond and Garcia both cite to In re D.S., which in turn cites to Turney. But Turney contains no limitation on the import of a break in the chain of custody; instead, as noted above, it approvingly cites cases where courts held that evidence was improperly admitted because the government failed to sufficiently prove an unbroken chain of custody. See Turney, 626 A.2d at 874-75. Garcia also cites to Key v. United States, 587 A.2d 1072 (D.C.1991), which in turn relies on Bartley v. United States, 530 A.2d 692 (D.C.1987), and Morrison v. United States, 417 A.2d 409 (D.C.1980). But neither case involved-a challenge to the government’s proof of chain of custody, and the cited passages in these two cases address only the sufficiency of the evidence regarding the operability of a weapon.

. At least initially, the court recognized the deficiencies in Mr. Turner's testimony regarding chain of custody and twice denied premature motions from the government to admit ballistics material into evidence. The government made the first motion without having elicited any evidence about chain of custody from Mr. Turner — indeed, without eliciting any evidence that his crime-scene search team had taken possession of ballistics material at the scene. The government made the second motion having established only that ballistics material was collected by the crime-scene search team but having elicited no testimony from Mr. Turner about what the police did with this evidence. On both occasions, the court correctly observed that the government had to show that it had maintained continuous custody and control over the proffered evidence.

. Mr. Turner’s testimony that this evidence should have been documented is consistent with MPD General Order 304.08, supra note 6, which provides that the "crime scene examination section supervisor” is "responsible for ... [mjaintaining an appropriate file documenting actions taken at all crime scenes,” including "[a] complete inventory of all items taken as evidence”, as well as ”[t]he results of any examination made of such evidence." Id. at 13.

. As noted above, a break in the chain of custody does not require exclusion of physical evidence if the government can establish its genuineness and integrity by other means. See supra note 3; see also, e.g., Mejia, 597 F.3d at 1337 (D.C.Cir.2010) (holding that the trial court did not abuse its discretion by admitting the government’s proffered document, notwithstanding a break in the chain of custody, because the government offered “substantial corroborative evidence tying the [document] to Mejia,” and “the brief (ten-minute) gap [in the chain of custody] ma[d]e[ ] implausible that it was planted, tampered with or misidentified.").
But the government did not carry that burden here. That Mr. Mulderig engraved the ballistics material might resolve questions about genuineness and integrity after that point, but it has no bearing on the break in the government’s chain of custody evidence that preceded Mr. Mulderig's involvement. Mr. Turner's testimony purporting to identify the live bullet in Exhibit 1 is also insufficient to justify admission of all of the ballistics material proffered by the government: his testimony concerned only one of the government's forty-four exhibits. Even as to Exhibit 1, Mr. Turner never explained how it was possible for him to identify a single, fungible bullet; he did not even testify as to its make or caliber. Instead it appeared that he relied on its presence in the bag marked as Exhibit 1 — a bag with a hole that Mr. Turner could not account for.