*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-47

DYLAN C. MILLHAUSEN, APPELLANT,

v.

UNITED STATES, APPELLEE.

On Appeal from the Superior Court
of the District of Columbia
(CF3-13461-16)

(Hon. Ronna L. Beck, Trial Judge)

(Argued November 17, 2020                    Decided July 8, 2021)

*Matthew B. Kaplan* for appellant.

*Matthew Covert*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Ethan Carroll*, and *Puja Bhatia*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Dylan C. Millhausen was convicted of assault with significant bodily injury, and his sentence was enhanced on the ground that he had committed a bias-related crime. Mr. Millhausen argues that (1) the

evidence was insufficient to disprove his claim of self-defense and (2) the trial court erroneously admitted into evidence statements elicited from Mr. Millhausen in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). We conclude that the evidence was sufficient to disprove self-defense, but we agree with Mr. Millhausen's *Miranda* claim.

## I.

In sum, the following evidence was presented at trial. One evening in August 2016, Nicole Vives, Michael Vives, and Mehtab Bakhshi went to a bar. An argument eventually broke out between Mr. Bakhshi and Mr. Vives. The group left the bar, and the argument continued outside.

While Mr. Bakhshi and Mr. Vives were arguing, Mr. Millhausen approached Ms. Vives. After a brief conversation, Mr. Millhausen invited Ms. Vives to get pizza. Mr. Millhausen seemed drunk. Ms. Vives told Mr. Millhausen that she was with Mr. Vives and Mr. Bakhshi, whom she identified as her husband and friend, respectively. Mr. Millhausen asked if Mr. Bakhshi had been bothering her.

Mr. Millhausen thereafter approached Mr. Bakhshi from behind, removed Mr. Bakhshi's turban, and dropped the turban on the ground. Mr. Bakhshi is a Sikh, and he wore the turban for religious reasons, to keep his head covered in public. Mr. Bakhshi turned and threw a punch at Mr. Millhausen, but the punch did not connect. Mr. Millhausen responded by punching Mr. Bakhshi in the face multiple times. Mr. Bakhshi fell to the ground, and Mr. Millhausen continued to punch Mr. Bakhshi in the face. Mr. Bakhshi lost consciousness, and he was unresponsive to police officers who responded to the scene. Mr. Bakhshi was taken to the hospital, where he was diagnosed with a head injury, a bruise, and contusions. Mr. Millhausen was not heard to make any racial or ethnic remarks during the altercation.

Police officers detained and handcuffed Mr. Millhausen. Several clips from an officer's body-worn-camera footage showed Mr. Millhausen making various statements. Specifically, Mr. Millhausen expressed the view that a lot of people had been hurt in Germany, France, Italy, and other countries, but "this is the United States" and that "you bring that shit here, it ain't gonna end well." In the presence of the jury, the trial court took judicial notice of the fact that in 2016 there had been "significant publicity regarding attacks or plots in France, Italy, and Germany that some attributed to Islamic extremists."

**II.**

Mr. Millhausen argues that the evidence was insufficient to disprove his claim of self-defense. We disagree.

"When assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Miller v. United States*, 209 A.3d 75, 77 (D.C. 2019) (brackets and internal quotation marks omitted). "[W]e will overturn a conviction on insufficient proof grounds only if there was no evidence adduced at trial upon which a reasonable mind could find guilt beyond a reasonable doubt." *Augustin v. United States*, 240 A.3d 816, 823 (D.C. 2020) (internal quotation marks omitted). Where evidence of self-defense is present, the government bears the burden of disproving self-defense beyond a reasonable doubt. *Rorie v. United States*, 882 A.2d 763, 776 (D.C. 2005).

The United States argues that Mr. Millhausen had no right of self-defense because Mr. Millhausen initiated the altercation by removing Mr. Bakhshi's turban. We need not decide that issue. Even if Mr. Millhausen had a right of self-defense after Mr. Bakhshi attempted to punch Mr. Millhausen, there is "no right to use

excessive force in self-defense." *Hart v. United States*, 863 A.2d 866, 874 (D.C. 2004). In this case, a reasonable jury could find beyond a reasonable doubt that Mr. Millhausen used excessive force in responding to a single missed punch by (1) punching Mr. Bakhshi multiple times in the face, causing Mr. Bakhshi to fall to the ground; (2) continuing to punch Mr. Bakhshi in the face even after Mr. Bakhshi fell to the ground; and (3) causing Mr. Bakhshi to lose consciousness. *Cf., e.g., id.* ("[T]he evidence of the injuries suffered by the complainant—coupled with the fact that appellant suffered none of consequence—permitted the jury to find that appellant forfeited [the] right of self-defense by using excessive force.").

## III.

Mr. Millhausen also argues that his statements in the clips from the body-worn-camera footage were erroneously admitted in violation of the requirements of *Miranda*. We agree.

## A.

Before interrogating a suspect in custody, the police generally must warn the suspect that "he has a right to remain silent, that any statement he does make may

be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (internal quotation marks omitted). Statements obtained in violation of *Miranda*'s requirements are generally inadmissible. *In re I.J.*, 906 A.2d 249, 255 (D.C. 2006). "In reviewing a trial court's denial of a motion to suppress on *Miranda* grounds, we defer to [the trial court's] factual findings. . . . However, we review the ultimate question of law de novo, and whether, on the established facts, appellant was under custodial interrogation without *Miranda* warnings is a question of law." *Johnson v. United States*, 207 A.3d 606, 611 (D.C. 2019); *see also Gilmore v. United States*, 742 A.2d 862, 868 (D.C. 1999) (whether defendant's statement was product of custodial interrogation "involves questions of both fact and law").

**B.**

Mr. Millhausen filed a pretrial motion arguing that the statements on the body-worn-camera footage should be suppressed under *Miranda*. The trial court held an evidentiary hearing, and the only evidence admitted at the hearing was approximately thirty minutes of body-worn-camera footage. That footage reflects the following.

At the beginning of the video, Mr. Millhausen was in handcuffs, standing in the street with two police officers. Mr. Millhausen told the police that he was scared. The officers had Mr. Millhausen sit down on the sidewalk, and they asked him for identification. Mr. Millhausen said that he was active-duty military and reiterated that he was scared. An officer asked Mr. Millhausen what happened, and Mr. Millhausen responded that he had been attacked. After some further discussion of Mr. Millhausen's ID, which was eventually located, the officer again asked "what happened?" and Mr. Millhausen again said he was attacked by a "guy." The officer asked, "[w]hat happened with him here? That's what I need to know, what happened." Mr. Millhausen responded by indicating that he had been talking with someone's girlfriend, that one person had been grabbing at another person's "head thing," and that Mr. Millhausen "ended up grabbing his head thing."

The officer then said "[a]lright, go back. So, he attacked you?" Mr. Millhausen asked about the status of the other participants and was told that one person was unconscious. Mr. Millhausen then explained that there was a fight, that he was trying to separate the parties, that "the dude attacked me," and that "[w]hen he tried to attack me, I showed no mercy and I beat the fuck out of him."

The officers and Mr. Millhausen then briefly discussed Mr. Millhausen's physical condition.  During that discussion, Mr. Millhausen said "they try to do that shit around me, it's not going to happen."  An officer asked whether the other person assaulted Mr. Millhausen first, and Mr. Millhausen said yes.  The officer asked what happened after that, and Mr. Millhausen said that he saw a fight, that he did not know the people involved, that he had tried to intervene to help, and that "when they came at me, I did my thing."  The officer asked what happened after that, how the other person ended up on the ground, and how Mr. Millhausen hit the other person.  Mr. Millhausen said that he was not sure where he hit the other person, but that he was not going to let the other person attack him.

After some further discussion, the officer asked if Mr. Millhausen was by himself when "all this happened," and Mr. Millhausen said yes.  The officer told Mr. Millhausen to "hold on one second while we finish our investigation," and then asked if Mr. Millhausen needed medical attention.  After declining medical attention, Mr. Millhausen said "[l]ook, this is the United States, that's all I'm saying look. . . . [Y]ou can try that shit in France, know what I mean, you can try that shit in Italy, look, you bring that shit here, it ain't gonna end well, you know what I mean?"  The officer responded, "Ok, I understand, hold on one second."

Mr. Millhausen and the officer continued their discussion of the incident, and Mr. Millhausen made a series of comments about other countries and the news: "[G]o ahead and try that shit, this ain't Spain motherfucker.  This ain't motherfucking France, motherfucker, go ahead."; "[L]ook when you hear about some bad shit on the news this one dude did that shit, . . . there's about a hundred motherfuckers, there's about a hundred listening, they're listening, and they're thinking, but not here, not here motherfucker.  You ain't gon do it here motherfucker.  We see you.  We see you.  It's not gonna happen."; and "We have a certain patience level.  . . .  [T]his is not France, you know.  I don't want to see a lot of people hurt like what's going on in Germany and France and all these other countries."

After some further discussion, the officer told Mr. Millhausen that a detective would be coming by.  Mr. Millhausen asked whether he needed to speak to the detective, and the officer said "Yeah."  The officer further explained that the detective would ask "the same types of questions me and the other officers was asking you, what happened, you know, what happened, you'll tell your side of the story."  After some further discussion, Mr. Millhausen again said that he was attacked, then said that "They play that shit over there.  They're not going to play that shit over here."  After additional discussion, Mr. Millhausen again said "This ain't Germany.  . . .  This ain't France."

Mr. Millhausen returned to a description of the incident, and the officer asked questions in response. Mr. Millhausen asked if he was going to be let go, and the officer indicated that she did not know, but that a crime had been committed. An officer once again asked Mr. Millhausen for his account of what happened. Mr. Millhausen said that he had seen an altercation, that he intervened, that someone tried to strike him, that he had reacted harshly, and that he might have thrown the turban.

Based on that evidence, the trial court granted the motion to suppress in part and denied it in part. The trial court concluded that Mr. Millhausen was in custody once he was handcuffed and that Mr. Millhausen had been interrogated in the absence of *Miranda* warnings. The trial court therefore suppressed evidence of a number of Mr. Millhausen's statements. The trial court concluded, however, that certain of Mr. Millhausen's statements were volunteered expressions of his world view and were neither responsive to specific questions nor part of a discussion about what happened during the incident. The trial court therefore ruled that the portions

of the body-worn-camera footage containing those specific statements were admissible.

## C.

We turn first to whether Mr. Millhausen was in custody. Custody occurs when a suspect "has been subjected to a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Broom v. United States*, 118 A.3d 207, 211-12 (D.C. 2015) (internal quotation marks omitted). "In evaluating whether a person was in custody for *Miranda* purposes, the only relevant inquiry is how a reasonable man or woman in the suspect's position would have understood [the] situation." *White v. United States*, 68 A.3d 271, 276 (D.C. 2013). The court considers the totality of the circumstances surrounding the encounter, looking at factors including:

> the use of handcuffs or other physical restraints on the suspect; communications from the police to the suspect, such as whether the police informed the suspect that the suspect was not under arrest and did not need to speak with the officers; the length of the detention or questioning; the nature of the questioning, such as whether it was accusatory or coercive; the location of the encounter, such as whether it occurred in public or private; the nature of any display of force by the police; and whether the suspect was confronted with evidence of guilt.

*Broom*, 118 A.3d at 212, 216 (citations omitted).

> [D]etention by use of handcuffs, although not strictly dispositive on this issue, strongly militates toward a finding of *Miranda* custody. . . . [H]andcuffing does not necessarily transform an investigative detention into an arrest, but it is recognized as a hallmark of formal arrest. . . . [N]either this court nor the Supreme Court has ever published an opinion in which it determined that a suspect in handcuffs was not in *Miranda* custody. While handcuffing does not end the inquiry, and must be considered in context of the totality of the circumstances, in order to outweigh the use of handcuffs, there must be strong indications on the other side of the ledger that there was not *Miranda* custody.

*Morton v. United States*, 125 A.3d 683, 689 (D.C. 2015) (footnote, citations, and internal quotation marks omitted).

Applying these principles, we agree with the trial court that Mr. Millhausen was in custody when he made the statements at issue. At the time he made the first disputed statement, Mr. Millhausen had been handcuffed for at least eight minutes. That "strongly militates" in favor of a conclusion that Mr. Millhausen was in custody, and we see no "strong indications on the other side of the ledger." *Morton*, 125 A.3d at 689. The United States argues that the detention was relatively brief, the officers did not brandish weapons, and Mr. Millhausen was not told that he was under arrest but rather was told that the police were investigating. Our decision in *Morton* makes clear that those circumstances do not suffice to outweigh the coercive

effect of handcuffing. *Morton*, 125 A.3d at 689-91 (defendant was in custody at time of questioning, where police seized defendant on public street after defendant fled; police handcuffed defendant; police advised defendant he was not under arrest; police did not brandish weapons; and police promptly questioned defendant); *see also White*, 68 A.3d at 279-83 (defendant was in custody during traffic stop, where defendant was handcuffed; defendant was not told whether he was arrested or not; police did not brandish weapons; and police questioned defendant immediately).

**D.**

It appears to be undisputed that the officers interrogated Mr. Millhausen. *See generally Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining "interrogation" as including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect") (footnote omitted). The United States argues, however, that the trial court nevertheless correctly declined to suppress the statements at issue, because those statements were not responsive to the officers' interrogation and instead were "volunteered" by Mr. Millhausen. We are not persuaded by this argument.

We conclude that the statements at issue were responsive to the officers' interrogation. The officers repeatedly asked Mr. Millhausen what happened. That is a "very general question." *Long v. United States*, 940 A.2d 87, 96 (D.C. 2007). The question would naturally be understood as an invitation for Mr. Millhausen to, in the words of one of the officers, "tell [his] side of the story." The United States appears to suggest, however, that statements reflecting what Mr. Millhausen *thought* about what happened were not responsive to questions about what *happened*. We disagree. In our view, a general question about what happened during an incident would naturally elicit answers that included what the participants in the incident were thinking and why they did what they did.

Moreover, we disagree with the United States's argument that Mr. Millhausen's statements had no logical nexus to the subject of the interrogation. The United States's position, both at trial and on appeal, has been that the statements at issue were evidence of why Mr. Millhausen assaulted Mr. Bakhshi: i.e., that Mr. Millhausen was giving bias-related reasons for his assault. It necessarily follows that Mr. Millhausen's statements were logically responsive to the officers' repeated and successful efforts to get Mr. Millhausen to tell his side of the story.

Finally, the United States argues that the statements at issue were spontaneously volunteered, and thus not subject to suppression under *Miranda*. In support of that argument, the United States points out that the officers' conversation with Mr. Millhausen at times touched on topics not directly related to Mr. Millhausen's guilt or innocence, such as Mr. Millhausen's medical condition, his military service, and the status of the investigation. The United States also points out that there were brief interludes of silence (none of much more than a minute) during the conversation. We do not view those circumstances as supporting a conclusion that the statements at issue were truly volunteered. Silence and rapport-building are both established interrogation techniques. *See, e.g.*, *Hill v. United States*, 858 A.2d 435, 444 (D.C. 2004) (creation of "verbal vacuum" is "classic interrogation technique[]"); *State v. Juranek*, 844 N.W.2d 791, 802 (Neb. 2014) (building rapport can "facilitate further interrogation") (ellipses and internal quotation marks omitted). Whether or not the officers in this case were consciously using those techniques, we see no basis for concluding that brief periods of silence and brief discussion of more benign topics eliminated the coercive effects of the ongoing *Miranda* violation. Relatedly, we see no basis for artificially dividing the single ongoing interrogation in this case into a series of discrete incidents and treating some of the statements during that interrogation as "volunteered" simply because they did not immediately follow a specific question.

In sum, we conclude that the statements at issue in this case were the product of an ongoing custodial interrogation conducted in violation of the requirements of *Miranda*. *See, e.g., State v. Martin*, 816 N.W.2d 270, 283 (Wis. 2012) (rejecting argument that "an incriminating statement offered by a suspect who has not been Mirandized during the course of a custodial interrogation is admissible simply because that particular statement, viewed in complete isolation, appears 'voluntary'"; "[n]o significant amount time elapsed between" *Miranda* violation and supposedly "volunteered" statements, and "in such cases there must be a break between the two exchanges, evidenced by factors like a lapse in time, change in personnel, change in location, or change in the content of the questions and answers"); *Johnson v. Kentucky*, No. 2003-CA-002745-MR, 2005 WL 789331, at *3 (Ky. Ct. App. Apr. 8, 2005) ("It is true . . . that a *Miranda* violation does not taint subsequent statements sufficiently removed from the violation to be deemed . . . a spontaneous utterance, but here . . . the delay of just a few minutes between the improper questions and [defendant's] response did not render the response spontaneous.  The custodial circumstances had not changed, the delay was brief, and the questions clearly evoked the statement.").

The published decisions relied upon by the United States are not to the contrary. Rather, those decisions involve circumstances quite different from those of the present case. *See, e.g.*, *Jones v. United States*, 779 A.2d 277, 283-84 (D.C. 2001) (en banc) (police asked suspect for ID or for identifying information, which did not constitute interrogation under circumstances of that case, and suspect's incriminating response lacked "the slightest logical nexus" to question); *United States v. Cole*, 315 F.3d 633, 635-37 (6th Cir. 2003) (officer asked single question at scene of arrest and defendant responded; officers transported defendant to police station and then to jail; at station and while being transported to jail, defendant made incriminating statements without any questioning by police; court concluded that later statements were "independent," "spontaneous," and "unprovoked by [the] initial question at the scene of the crime"); *Medeiros v. Shimoda*, 889 F.2d 819, 821, 824-25 (9th Cir. 1989) (first statement obtained in violation of *Miranda* did not taint later volunteered statements, where first statement was made on scene in response to single question by one officer; defendant was taken to station and booked; defendant volunteered later statements about thirty minutes after on-scene statement, in absence of questioning by officers; and officers advised defendant not to make statements but defendant nevertheless continued). The United States does cite several unpublished trial-court decisions that are somewhat more factually comparable to the present case. *See, e.g.*, *United States v. Daniels*, Cr. Action No.

09-569-01, 2010 WL 2163844, at *4 (E.D. Pa. May 27, 2010) (declining to suppress volunteered statement made approximately two minutes after *Miranda* violation, where officer executing search warrant asked single question about whether there were firearms in house; defendant responded with denial; and when officer found gun, defendant said gun was his). For the reasons we have stated, however, we do not find those decisions persuasive support in the circumstances of the present case.

We therefore conclude that the statements at issue in this case ought to have been suppressed. We agree with the parties that, given our holding that all of the statements at issue were erroneously admitted, Mr. Millhausen's bias-related enhancement must be vacated but his conviction for assault with significant bodily injury is unaffected.

In sum, we affirm Mr. Millhausen's conviction for assault with significant bodily injury, vacate the bias-related enhancement, and remand for further proceedings.

*So Ordered.*